## VAN DEVENTER et al. v. GULF PRODUCTION CO.
### No. 1715.

Court of Civil Appeals of Texas. Beaumont.
March 6, 1931.

Rehearing Denied Sept. 23, 1931.

E. B. Pickett, Jr., of Liberty, for appellants.

John E. Green, Jr., of Houston, Llewellyn & Dougherty and P. C. Matthews, all of Liberty, O. S. Parker, of Beaumont, and Claude McCaleb, of Houston, for appellee.

## WALKER, J.

When John W. Clayton died, he left to his heirs a tract of 300 acres of land in the David Minchey League in Liberty county. One of the heirs sold by specific metes and bounds 75 acres out of the southwest corner of this tract, identified in the record in this case as the Antoine tract. Later another tract of 80 acres was sold off the northwest corner of the 300-acre tract, lying immediately north of the Antoine tract. These two tracts consumed all the western end of the 300-acre tract except a small strip of land lying between the south boundary line of the Antoine tract and the south boundary line of the 300-acre tract, 46 feet wide at its eastern end and extending west about 3,000 feet to a point. The sale of the two tracts just named left 145 acres of the original tract which, on the 19th day of January, 1920, was owned by appellants, Mrs. Martha Van Deventer and her two children, L. Q. Van Deventer and her daughter Mrs. Nena Mahavier, in the following proportions, to wit: Mrs. Van Deventer owned an undivided two-thirds interest and each of the children an undivided one-sixth interest. On that date Mrs. Van Deventer and her daughter, Mrs. Mahavier, joined by her husband, executed a mineral lease, conveying the entire 145 acres to appellee, Gulf Production Company. This lease did not purport to convey only the undivided interest of Mrs. Van Deventer and her daughter, but all the interest, as if they were the sole owners of the land. However, appellee knew of the interest of L. Q. Van Deventer at the time it took the lease and tried unsuccessfully, both before and after its execution, to secure a lease from him, offering him at one time $17,000 bonus for a lease on his interest. The consideration paid to Mrs. Van Deventer and her daughter for this lease was a bonus of $1,400 cash and semi annual payments of $700 each as delay rental. This delay rental was paid to Mrs. Martha Van Deventer and Mrs. Mahavier on the following dates, that is to say, a payment of $700 was made to them on each of the following dates: January 15th and July 15th of the years 1921, 1922, 1923, and 1924. In the letters transmitting this money to Mrs. Van Deventer and Mrs. Mahavier, the statement was made that the payment was received by them as "being full payment for delay in drilling for the period and under the terms of said lease mentioned above." On March 18, 1922, after appellee had paid three of the extension payments above described, all of the appellants, for a valuable consideration paid them, to wit, $100, executed an option contract to Mrs. Nonie O'Brien giving her the right to purchase 72½ acres of the land covered by the above-described lease. On April 12, 1922, in recognition of this option. all three appellants executed to Higgins Oil & Fuel Company a warranty deed to 25 acres of the land covered by the option. In Texas Company v. Van Deventer (Tex. Civ. App.) 290 S. W. 560, is reported a map or plat of the John W. Clayton 300-acre tract, showing its subdivisions as above described, with the small strip of land lying between the south line of the Antoine tract and the south line of the 300-acre tract. As will be explained later in this opinion, that case involved certain phases of this litigation.

This suit was filed on April 20, 1925, by appellants L. Q. Van Deventer and his sister, Mrs. Nena Mahavier, and her husband, against their mother, Mrs. Martha Van Deventer, one of the appellants herein, and Gulf Production Company, the appellee, as a partition suit. The plaintiffs in their petition alleged that they owned an undivided interest of 62.069 acres in the remaining 120 acres after the sale to Higgins Oil & Fuel Company. The balance of the 120 acres, to wit, 57.931 acres, was conceded to their mother with the allegation that appellee had a mineral lease thereon. By an amended answer appellee, Gulf Production Company, answered this petition by general demurrer and special exceptions and by claiming a lease on all the land with pleas of estoppel and ratification

against L. Q. Van Deventer. Also, appellee made Higgins Oil & Fuel Company and the Texas Company parties to this suit on allegations that they were asserting adverse claims to a part of the land in controversy. On October 19, 1925, on motion of the plaintiffs in the partition suit, the trial court ordered a severance in the case, leaving the controversy between the Van Deventers and Gulf Production Company in the original suit and docketing a new suit with these appellants and appellee Gulf Production Company and Higgins Oil & Fuel Company as plaintiffs and with the Texas Company as sole defendant. The purpose of that suit was to locate the eastern boundary line of the Texas Company tract of 80 acres above referred to and shown on the map reported in Texas Co. v. Van Deventer, supra. On the trial of that case judgment was entered in favor of the plaintiffs therein against the Texas Company. The Texas Company duly prosecuted its appeal to this court. Our opinion affirming that judgment is reported, Texas Co. v. Van Deventer, supra. On January 21, 1926, the first amended original petition was filed herein naming as plaintiffs L. Q. Van Deventer, his sister, Mrs. Nena Mahavier and her husband, and Mrs. Martha Van Deventer, and naming as sole defendant Gulf Production Company. By this petition, for the first time, appellants brought into the case the narrow strip of land between the south line of the Antoine tract and the south line of the 300-acre tract. In our subsequent discussion this strip will be designated merely as "the wedge." On September 17, 1926, plaintiffs filed their third amended original petition, upon which the case went to trial. The following issues were made by this petition: (a) Trespass to try title. (b) Mrs. Mahavier pleaded that the lease as to her was void because the officer taking her acknowledgment to the lease failed to ask her the statutory questions and failed to comply with the statute in taking her acknowledgment. On this allegation she pleaded a willful trespass by appellee, resulting in the destruction of the rental value of her land as oil property. As an alternative plea she joined with her mother (c) in allegations that Gulf Production Company had failed to comply with the obligation of its lease by properly developing the land and by failing to drill the necessary offset wells called for by the lease. Under these allegations they stated specifically the amount claimed by them for the alleged breach of the lease. (d) They also claimed exemplary damages. L. Q. Van Deventer pleaded that the Gulf Production Company willfully trespassed upon his land; that at the time of the trespass the land had a high bonus rental value as well as the usual royalty value; and that in making the trespass Gulf Production Company destroyed his property as oil property and caused him the loss of its rental value. He also claimed exemplary damages. The petition was specific in itemizing the several items of damage claimed by each plaintiff.

On October 17, 1927, appellee, Gulf Production Company, filed its second amended original answer upon which the case was tried. By this answer it pleaded general and special demurrers and by special plea claimed a lease on all the land under the above-described lease. Further it pleaded estoppel and ratification against both Mrs. Mahavier and L. Q. Van Deventer. The facts of the ratification will be given in connection with the discussion of that issue.

The following additional facts are necessary to an understanding of the issues submitted to the jury: On January 15, 1925, Gulf Production Company began drilling the Martha Van Deventer Well No. 1 on its 145-acre lease; this well being on that portion of the lease embraced in the above-described deed executed and delivered by the Van Deventers to Higgins Oil & Fuel Company. This well was completed on March 15, 1925, with an initial production of 4,000 barrels per day, but on March 28th was making salt water, which rapidly increased to 80 per cent. salt water, limiting its total production to 99,120 barrels. April 4, 1925, Gulf Production Company, having under lease both the Antoine tract of 75 acres and all the land lying immediately south of the south line of the 300-acre tract, began drilling on the Antoine tract a well designated as Antoine No. 3, which was completed on May 13, 1925, with an initial production of 1,650 barrels, its total production being 138,200.89 barrels. On May 26, 1925, Gulf Production Company began drilling its Martha Van Deventer No. 2 upon the 120 acres involved in this suit, exclusive of "the wedge," located and drilled as an offset to Antoine Well No. 1. Drilling was completed on this well on July 12, 1925. The well was not a producer. No oil whatever was produced therein. No other well was drilled on the Van Deventer 120-acre tract and no other location was ever made thereon by the Gulf Production Company. With the exception of Antoine No. 1, which was offset by Van Deventer No. 2, no other producing well was drilled within 200 feet of the lines of the 120 acres, exclusive of "the wedge," except Antoine No. 5, which was begun on November 14, 1925, and drilled to completion January 7, 1926, coming in as a salt-water well. It was consequently abandoned. However, south of the south line of "the wedge," within 200 feet of that line, appellee drilled its Duessen No. 11, which was a producing well.

Answering special issues, the jury found the following facts:

First. The market value of an oil and mineral lease upon an undivided interest of

about 20 or 25 acres in the 120-acre tract of land, during a period of time from on or about the 1st day of January, 1925,.to about three or four months thereafter, was $1,500 per acre.

Second. The Gulf Production Company drew and drained from and under the 120 acres of land, exclusive of "the wedge," through its Antoine Well No. 1, 13,800 barrels of oil.

Third. Through Antoine No. 3 and Duessen No. 11 Gulf Production Company drained from and under "the wedge" 74,943.4 barrels.

Fourth. The Gulf Production Company willfully, wrongfully, and maliciously made and asserted a claim of title to the undivided interest owned by the plaintiff L. Q. Van Deventer in and to the 120 acres of land, and did willfully, wrongfully, and maliciously enter upon and take the actual possession of said 120 acres of land, and did start drilling thereon, claiming that it had the exclusive right to drill and develop said tract of land for oil, and did actually hold possession thereof for that purpose, and did wrongfully and willfully and maliciously draw and drain oil from and under said 120 acres of land and did convert and appropriate such oil to its own use and benefit.

Fifth. The jury assessed against Gulf Production Company in favor of L. Q. Van Deventer $1,000 exemplary damages.

Because of alleged conflicts between the answers to the following questions, we give the questions as submitted to the jury, together with the jury's answer thereto.

"Question No. VI. Did the defendant, Gulf Production Company, wilfully, wrongfully and maliciously violate and breach the terms and conditions of the said lease of date January 19th, 1920, and did the defendant, Gulf Production Company, wilfully, wrongfully and maliciously draw and drain any oil from and under that part of said 120 acre tract of land which lies immediately east of and adjoining the Antoine tract, and excluding that part of said 120 acre tract which is the wedge shape strip between the Antoine tract on the north and the Duessen tract on the south, and convert and appropriate such oil, if any, to its own use and benefit, substantially as alleged in paragraphs 18, 20, 23 and 25 of plaintiffs' said third amended original petition? (Answer yes or no)." Answer to Question No. VI: "Yes."

"Question No. VII. What amount of money, if any, should the defendant, Gulf Production Company, pay to the plaintiff, Mrs. Nena Mahavier, as exemplary damages? (Let your answer to this question, if any amount you may find from the evidence, state the amount in money.)" Answer to Question No. VII: "None."

"Question No. VIII. What amount of money, if any, should the defendant Gulf Production Company, pay to the plaintiff, Mrs. Martha Van Deventer, as exemplary damages? (Let your answer to this question, if any amount you may find from the evidence, state the amount in money.)" Answer to Question No. VIII: "None."

"Question No. IX. Did the defendant, Gulf Production Company, between the 16th day of March, 1925, and the 21st day of January, 1926, proceed to drill and complete on that part of said 120 acre tract of land which lies immediately east of and adjoining the Antoine tract, and excluding that part of said 120 acre tract which is the wedge shape strip between the Antoine tract on the north and the Duessen tract on the south, such offset wells as a prudent, responsible operator would have drilled, during that time, upon that part of said tract of land which lies east of and adjoining the Antoine tract, if he was the owner of said land? (Answer yes or no.)" Answer to Question No. IX: "Yes."

"Question No. X. Did the defendant, Gulf Production Company, proceed by and through the use of reasonable care and diligence (as that term is hereinbefore defined) to properly and adequately develop for oil that part of said 120 acre tract of land which lies immediately east of and adjoining the Antoine tract, and excluding that part of said 120 acre tract which is the wedge shape strip between the Antoine tract on the north and the Duessen tract on the south, between the 16th day of March, 1925, and the 21st day of January, 1926? (Answer yes or no.)" Answer to Question No. X: "Yes."

On this verdict judgment was entered in favor of Mrs. Van Deventer and Mrs. Mahavier for their interest in the drainage through Antoine Well No. 1, and in favor of L. Q. Van Deventer for the damages suffered by him because of the trespass; also the lease was canceled and L. Q. Van Deventer recovered his one-sixth interest in the land. Both parties excepted to the judgment and have prosecuted appeals to this court. For convenience we designate the plaintiffs below as appellants and the defendant below as appellee.

### Opinion.

██ Mrs. Mahavier excepted to the refusal of the court to submit to the jury the issue made by her pleading and evidence against the validity of her acknowledgment to the lease. We do not give the details of this plea nor the evidence offered in support thereof because, for the following reasons, this issue is not available to Mrs. Mahavier. By her pleading and evidence she sought, on this issue, to bring her case within the rule announced by this court in Kishi v. Humble Oil & Refining Co., 261 S. W. 228, and by the

Supreme Court in the same case, Humble Oil & Refining Co. v. Kishi, 276 S. W. 190, and on the second appeal by this court in the same case, Humble Oil & Refining Company v. Kishi, 299 S. W. 687. The rule is that a wrongful entry upon land by one cotenant, denying the right of entry to his cotenant, and the wrongful development of the land for oil constitutes an actionable trespass. We say that the invalidity of Mrs. Mahavier's lease is not an issue in this case because she and her husband gave their consent to the entry. When she filed her petition on April 20, 1925, she made no attack on the lease. To illustrate her construction of the lease at that time and until the filing of her first amended original petition in January, 1926, we quote as follows from her brief: "As for Mrs. Mahavier, in the petition filed in the partition suit (it being the original petition filed in this case) no allegation was made whereby Mrs. Mahavier attacked the lease signed by her on January 19th, 1920, and which, on its face, purported to apply to and include her interest in the tract of land covered by the lease. But that suit was filed by Mrs. Mahavier and L. Q. VanDeventer, jointly, was simply one for partition and under the original petition as filed no proof could have been made showing the nullity of the lease as to Mrs. Mahavier, nor could any judgment have been rendered upon said petition, cancelling the lease as to her. Therefore, Mrs. Mahavier did not, by any pleading she filed in said partition suit, deny the right of the Gulf Production Company to enter upon and drill, under and in accord with the terms and conditions of the lease, the land covered by the lease which Mrs. Van Deventer had executed and Mrs. Mahavier had signed. Not until afterwards did Mrs. Mahavier attack said lease as to her undivided interest in the land, or undertake to have the lease cancelled. In the amended petition filed January 21st, 1926, she, for the first time, attacked the lease as being void because not acknowledged by her in the manner required by statute, and in this same petition, she first undertook (by pleading in the alternative) to have the lease cancelled and also to recover damages caused by defendant's breach thereof."

Certainly the facts thus summarized by her do not constitute an actionable trespass, that is, "intentional" trespass, as that word was used by the Supreme Court in Bender v. Brooks, 103 Tex. 335, 127 S. W. 168, Ann. Cas. 1913A, 559. Having consented to the entry, she cannot complain of damages resulting from the entry. Had Gulf Production Company produced oil through the surface of her land, we would have a different question before us. But no oil was produced through the surface of her land. Therefore, she can have no relief on the theory that her lease was void.

But alternatively she joined with her mother in asking for relief on the theory that Gulf Production Company had breached the lease by failing properly to develop it and by failing properly to drill the necessary offset wells. It was on this theory that judgment was entered in their favor.

After the return of the verdict, but before entry of judgment, appellants, by written motion, asked the court to order a mistrial because of conflicts between the answers to question No. 6 and questions Nos. 7, 8, 9, and 10, as copied above. By answering question No. 6 the jury found that Gulf Production Company had breached the lease under conditions making it liable for exemplary damages. But notwithstanding it had found all the essential elements of exemplary damages in answering Question No. 6 by its answers to questions Nos. 7 and 8, it denied a recovery of exemplary damages to Mrs. Mahavier and Mrs. Martha Van Deventer. Appellants assert conflicts between these answers because they contend that since the jury had found every essential element of exemplary damages in their favor, it was required, as a matter of law, to assess some damages in answer to questions Nos. 7 and 8. This is not a sound legal proposition. Though by its answer to question No. 6 the jury found every essential element of exemplary damages, it was not required to assess such damages against appellee. Appellants have cited us to no case where any appellate court has said that exemplary damages must be assessed merely because the jury found the essential elements of such damages. The only suggestion to that effect called to our attention is in Mayer v. Duke, 72 Tex. 445, 10 S. W. 565, 569, where it was said: "An examination of the cases in our own reports will show that the trial judges have ordinarily used the term 'may' in charging upon this subject. Yet it seems to us that in many cases, at least, it would not have been error for them to have gone further, and instructed the juries that they should find exemplary damages, if they found the facts proved which warrant such damages." That case is not authority for the proposition that where the elements of exemplary damages are found by the jury a peremptory charge should be given that some amount of damages should be assessed. In 8 R. C. L. 666, discussing this proposition, it is said: "The allowance of exemplary damages rests in the discretion of the jury, but the court has no right to tell the jury that they shall award such damages, and it is error to instruct or intimate in an instruction that the plaintiff is entitled to them as a matter of right." In Cotton v. Cooper, 209 S. W. 135, 138, Judge Sonfield, speaking for the Commission of Appeals, said: "Exemplary damages are in the nature of a punishment. They are not awarded to enrich the injured party, but are intended rather for the public good." In

Evans v. McKay (Tex. Civ. App.) 212 S. W. 680, 685, it was said: "Exemplary damages are awarded as matter of sound public policy in punishment of the guilty one for malicious acts, and not as compensation. The amount awarded goes to the complaining party merely because assessed in his suit." From these decisions it follows that an injured party has no vested right in exemplary damages. If the essential elements of such damages exist in his case, the jury may, in punishment of the guilty party, assess such damages; but if the jury refuses to assess such damages, whatever may be the facts, the injured party has no ground of complaint.

■■ Appellants correctly assert a conflict between the answers to question No. 6 and question No. 9; for by its answer to question No. 6 the jury found that Gulf Production Company had willfully, wrongfully, and maliciously drawn and drained oil from and under the 120 acres of land exclusive of "the wedge," and by answer to question No. 9 the jury found that the Gulf Production Company had drilled such offset wells as a prudent, responsible operator would have drilled in protecting the lines of the 120 acres had it been the owner of the land. There is an irreconcilable conflict between these answers. To avoid the effect of this conflict appellee, before judgment was entered, filed the following waiver:

"Now comes the Gulf Production Company, defendant in the above entitled and numbered cause, and before the entry by the court of judgment herein, upon the findings of the jury heretofore returned, and in open court, presents and says:

"That if, in the judgment of the court, the finding of the jury in this cause, in answer to special issue No. 9, presents such a conflict as would present the rendition of a judgment upon the findings herein, then said defendant, Gulf Production Company, hereby waives any advantage in its favor by reason of such conflict and waives its right to urge such conflict as a ground of attack upon such judgment as the court may render for the plaintiffs herein upon the jury's answer to special issue No. 2.

"And this defendant hereby now voluntarily tenders back to the plaintiffs said lease of January 19, 1920, insofar as same applies to the 120 acres of land involved herein together with all rights thereunder, and reinvests plaintiffs with all rights and titles given and conveyed by said lease aforesaid in and to said 120 acres of land, and here now, in open court, consents that the court may enter judgment cancelling said lease irrespective and regardless of the findings of the jury."

The effect of this waiver was to confess, by appellee, a breach of the covenants of the lease sufficient to void it and to admit and confess that judgment might be entered on the verdict as if the jury had answered "no" to question No. 9, instead of "yes." On this construction of the waiver and of the verdict judgment was entered in appellants' favor canceling the lease and awarding Mrs. Van Deventer and Mrs. Mahavier damages for drainage through Antoine Well No. 1, that is, from all their land except "the wedge." It follows that the conflict between questions Nos. 6 and 9 was thus made immaterial.

■■ In our judgment no conflict exists between the answers to question No. 10 and question No. 6. By question No. 10 the jury found that appellee had proceeded "by and through the use of reasonable care and diligence * * * to properly and adequately develop for oil the land in controversy" exclusive of "the wedge." No element of question No. 6 conflicts with this finding. True the jury found by its answer to question No. 6 that appellee "willfully, wrongfully and maliciously" violated and breached the terms and conditions of the lease, but this general language referred only to the wrongful drainage of the oil, submitted in the last part of the question. Though question No. 6 refers to paragraphs 18, 20, 23, and 25 of the third amended original petition where appellants pleaded fully the different acts constituting the breach, the specific language of the question submits only the act of drainage and the reference to the paragraphs of the petition carried the jury to the petition only for a fuller instruction on the acts constituting the drainage. The first part of the question, being general in its terms, is controlled and limited by the specific language following the general submission. Having called the jury's attention specifically to the act of drainage, and there being no language in the question properly construed, to extend the submission beyond that issue, the finding should be limited to the specific submission, which in no way conflicts with the answer to question No. 10.

■ We sustain the propositions of Mrs. Van Deventer and her daughter Mrs. Mahavier to the effect that the court erred in refusing them judgment for their royalty interest in the drainage from "the wedge." This drainage was fixed by the jury at 74,943.4 barrels of oil, of which Mrs. Van Deventer was entitled to two-thirds of one-eighth and Mrs. Mahavier one-sixth of one-eighth at the agreed price of $1.50 per barrel. Answering this proposition, appellee suggests, first, that "the wedge" did not exist. That contention is overruled. Under the undisputed evidence "the wedge" was shown to exist; at the least, that issue was raised by the evidence. The case was tried and submitted to the jury on the theory that "the wedge" existed. The questions were framed on the theory that "the wedge" existed, and no objection was reserved by appellee against this finding by the court. After judgment, it was too late to contend

that the existence of "the wedge" was not shown.

As a second counter proposition appellee contends that since neither party knew of the existence of "the wedge," at the time of the execution of the lease, and since it was not in the minds of the parties when the lease was executed, by a process of construction it should be read out of the lease. On this construction, after draining all the oil from "the wedge," appellee tendered it back to appellants as worthless oil property. This is not a sound proposition. Where the language of a lease is plain and unambiguous, the express language used must control its construction and the courts cannot look to the intention of the parties in construing the language; intent becomes material only upon allegations of rescission or reformation. What the lease purports to convey is conveyed, regardless of the intention of the parties. Hatcher v. Stipe (Tex. Civ. App.) 45 S. W. 329; Rettig v. Houston West End Realty Co. (Tex. Com. App.) 254 S. W. 765, 768; Davis v. George, 104 Tex. 110, 134 S. W. 326; McCarty v. Pugh (Tex. Com. App.) 265 S. W. 126, 127; Cherry v. Birzzolara, 89 Ark. 309, 116 S. W. 668, 670, 21 L. R. A. (N. S.) 508. Thus in Taylor Cotton Oil Co. v. Early-Foster Co. (Tex. Civ. App.) 204 S. W. 1179, 1180, it was said: "Where there is no ambiguity in a written contract, the intention of the parties thereto is to be gathered from the language used." Upon proper allegations of mistake, duly and seasonably pleaded, a lease may be reformed or corrected. But to have that relief it is primary law that the complaining party must place "the defendant in the same situation he was in before the transaction took place." Kesler v. Zimmerschitte, 1 Tex. 55. In Black on Rescission and Cancellation, Second Edition, § 127, it is said: "The remedy of rescission cannot be had without restoration of the status quo or restitution." In this case appellee can place appellants in the same situation they were in before the lease was executed only by paying for all the oil drained by it from under "the wedge" as per its leasing obligations. Having released this land to appellants, appellee is bound in law to pay for all damage done by them to it while covered by its lease. It follows that the judgment in favor of Mrs. Van Deventer and Mrs. Mahavier should be reformed by adding thereto the value of their royalty interest in the drainage from "the wedge," as above calculated and as so reformed it is affirmed.

We agree with appellee's contention that it should have had an instructed verdict against L. Q. Van Deventer on the issue of damages because of the trespass. Appellee pleaded against him that he had ratified the lease in question, which plea was sustained by all the testimony. As he has no alternative plea asking for judgment for his royalty interest, the judgment in his favor on the issue of damages must be reversed and here rendered against him. The following argument supports this conclusion: The facts establishing the issue of ratification are as follows:

(a) Though L. Q. Van Deventer owned an undivided one-sixth interest in the leased premises, his mother and sister did not recognize his interest in making the lease but leased all the land.

(b) The material portions of the lease are as follows: "It is further agreed that all the conditions and terms herein shall extend to the heirs, executors, legal representatives, successors and assigns of the parties hereto; but no change of ownership of a part of the land, or partition thereof, shall impose any additional obligation on the Lessee. Any change of ownership of a part of the land whether effected by conveyance, will, inheritance, partition or otherwise shall entitle the new owner to the rentals and all royalties accruing from operations on his segregated tract unless otherwise provided in the transfer; provided, the Lessee shall not be held responsible for the payment of such rentals or royalties to such new owner unless and until the Lessee shall be furnished with the instrument of transfer, or a duly certified copy thereof, and in case of no transfer in writing, with legally sufficient evidence thereof."

(c) On the 18th of March, 1922, L. Q. Van Deventer joined his mother and his sister, Mrs. Mahavier (Mr. Mahavier was not a party) in executing to Mrs. Nonie O'Brien an option contract to purchase 72½ acres of the 120 acres in controversy. This contract was as follows:

"Received of Nonie O'Brien, vendee—the sum of one hundred (100) dollars in part payment—for that certain tract or parcel of land out of the Van Deventer tract in the David Minchey League, Liberty County, Texas, being out of the North half of said tract, more fully described as follows:

"Seventy-two and one half acres of land beginning at the north east corner of the Frederick Antoine tract, thence west with the north line of the said Antoine tract, to the southeast corner of the tract purchased from Mrs. Van Deventer by E. E. Townes.

"Thence north with Townes' east line to the north line of the Van Deventer.

"Thence east with the north line of the Van Deventer to the northeast corner.

"Thence south with the east line of the Van Deventer to a point in the said east line, from which a line, drawn west to the place of beginning, would include half of the Van Deventer tract.

"This day sold, said Nonie O'Brien for the purchase price of Seventeen Thousand five Hundred Dollars ($17,500).

"It is understood and agreed that the above described tract may be divided into three (3) nearly equal blocks or lots, numbered respectively from West to East one, two and three and we agree to deliver a good and sufficient warranty deed to each lot on the following terms: To Lot No. One (1) on or before ten days from date upon a cash payment of Seven Thousand Five Hundred ($7,-500) dollars, including the consideration, this day paid. To Lot Two (2) on or before fifteen days from date, upon a cash payment of six thousand and two hundred and fifty (6250.00) dollars. And to lot three (3), on or before thirty days from date upon a cash payment of Three Thousand Seven Hundred and Fifty ($3750.00) Dollars. Said money to be paid into some bank agreed upon by vendor and vendee. Failure to make said three payments or either of them, as stated, shall terminate this contract.

"This sale is conditioned upon an authentic abstract, furnished by vendor, showing a good title to the property, and should the title to said property prove not good and cannot be made good within a reasonable time, not to exceed thirty days from the date hereof, then we obligate ourselves to return said One Hundred Dollars now paid upon the return and cancellation of this receipt.

"It is understood that the above described property is encumbered by an oil lease, and it is hereby agreed that purchaser waives all right to collect rental on said lease but that so long as said lease remains in force the rental shall be collected by the undersigned.

"Whereunto we set our hands this 18th day of March, A. D. 1922.

"Martha Van Deventer
"L. Q. Van Deventer
"Mrs. Chas. Mahavier."

Mrs. O'Brien paid L. Q. Van Deventer, his mother and sister, $100 cash for the option contract. In part execution of this contract L. Q. Van Deventer, his mother and sister, joined by her husband, for the cash consideration of $7,500 to them in hand paid by Higgins Oil & Fuel Company, conveyed to the Higgins Oil & Fuel Company by warranty deed 25 acres of land covered by the option contract. The material portions of this deed are as follows:

"To have and to hold the above described premises together with all and singular the rights and appurtenances thereto in any wise belonging, unto the said Higgins Oil & Fuel Company, its successors and assigns, forever. This conveyance is made subject to that certain oil, gas and mineral lease of date the 19th day of January, A. D. 1920, to Gulf Production Company, of record in Vol. 92, page 522, of the deed records of Liberty County, Texas, in so far as same affects property herein described.

"But it is understood that this conveyance carries such royalties as may be earned from the production of oil, gas or other minerals by virtue of said lease, in so far as it covers the property herein described, however, in the event of a production of oil from said premises under said lease it is understood that the royalty interest to be received by grantee is the royalty from oil produced from the premises herein described, so far as same is under lease, and that the grantee shall have no interest by reason of this conveyance in any royalty from oil or other minerals produced from lands not herein described although the same may be included in the lease affecting any of the minerals and premises herein conveyed, it being the intention of this conveyance to convey, assign and transfer unto said Higgins Oil & Fuel Company, in fee simple the land herein described and the oil and mineral royalties produced under said existing lease from the land herein described. Delay rentals, if any, hereinafter coming due under said lease shall not belong to grantee.

"We do hereby bind ourselves, our heirs, executors and administrators to warrant and forever defend all and singular said premises unto said Higgins Oil & Fuel Company, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof."

(d) The consideration for this deed was paid to Mrs. Van Deventer and given by her to L. Q. Van Deventer and her daughter in equal portions. She also gave to them at various times portions of the lease money received by her from appellee. Explaining this payment to her children, Mrs. Van Deventer testified as follows, this excerpt of her testimony being taken from appellants' brief: " * * * I just used that money like I would any other money that belonged to me, gave it to them or bought what I wanted to, just used it like I would any other money that I had, did whatever I pleased with it. I gave money to the children because they had an interest in the place."

Appellants advance the following argument supporting their contention that the facts summarized do not constitute a ratification against L. Q. Van Deventer:

"The argument of appellee is that this deed amounts to a ratification because of the reference therein to the lease of January 19th, 1920. First, it may be said that the language of this reference itself makes it plain that the lease was regarded as not applying to the whole of the property being conveyed or to the undivided interests in the entire tract of all of the grantors who joined in the Higgins Company deed. When writing into this deed the provisions that 'this conveyance is made subject to that certain oil, gas and mineral lease of date the 19th of January, 1920, the Gulf Production Company of record in Vol.

92, page 522, * * * in so far as same affects property herein described,' and that 'it is understood that this conveyance carries such royalties as may be earned from the production of oil, gas or other minerals by virtue of said lease, in so far as it covers the property herein described,' and also that 'it is understood that the royalty interest to be received by the grantee is the royalty from oil produced from the premises herein described, so far as same is under lease,' the parties to the deed very clearly indicated that the lease referred to did not apply to or cover the whole of the tract of land conveyed by the deed. The words 'in so far as same affects,' 'in so far as it covers' and 'so far as same is under lease', can mean only that the land being sold is subject to and covered by the lease to a partial or limited extent only. And it will be noted that the parties to the deed were careful to repeat the same limitation, by the use of words but slightly differing, three separate times in the deed, that is, when writing therein each recital which refers to the lease. In short, it is patent that the intent and effect of the Higgins deed, when tested by its own unambiguous terms, was to convey to the Higgins Company the definitely described 25 acres out of the Van Deventer tract, with only some portion or portions thereof, or some undivided interest therein, subject to and covered by the lease of January 19th, 1920. It is obvious that the undivided interest of L. Q. Van Deventer was not 'under lease' or 'covered by the lease,' because he did not execute the lease. * * * The lease did encumber the property to the extent of Mrs. Van Deventer's undivided interest therein, and on the face of it as to Mrs. Mahavier's interest also. They were the two owners who had signed the lease as lessors, and this option no doubt meant that said two persons, as lessors, were to continue to collect the rental which the Gulf Company was paying under the lease. After this option receipt was signed, the three parties signing it did not follow any definite course with reference to the rental from the course pursued by them before signing this option. All rental payments which matured prior to the date of this option were paid by the Gulf Company to Mrs. Van Deventer and Mr. and Mrs. Mahavier, and all payments maturing after that date were made to the same three persons. L. Q. Van Deventer at no time, either before or after he signed this option receipt, ever claimed any portion of this rental money nor did he ever receive or receipt for any of it. From the terms of the option itself, as well as the conduct of the three persons who signed it, it is obvious that they were not, as among themselves or as between any two of them, concerned about or attempting to affect any right, or to change any settled status, relative to their undivided interests in this jointly owned tract of land which was, to the extent of Mrs. Van Deventer's interest, subject to the lease executed to the Gulf Company by her on January 19th, 1920. Therefore, the recital that the land was subject to such lease was correct, but how far subject to it the option did not undertake to say. This option was needed for a temporary use only, and not intended for record or ever filed. It was, to an extent, superseded by the Higgins Company deed, into which the express provisions were written that specifically set forth the purpose and intention of the parties, and thereby we are informed just how far and to what extent the land they were dealing with was subject to and covered by the then existing lease held by the Gulf Company.

" * * * This deed also contains an additional provision reading: 'It being the intention of this conveyance to convey, assign and transfer unto said Higgins Oil & Fuel Company, in fee simple, the land herein described and the oil and mineral royalty produced under said existing lease from the land herein described.' When these recitals, or the portions or paragraphs of the Higgins deed wherein they appear, are considered as a whole, it is clear that the parties to this deed understood that the 'existing lease' did not apply to or cover all the undivided interests of the three persons who jointly owned the Van Deventer tract and that, therefore, in selling 25 acres out of said tract to the Higgins Company, it could acquire by the deed only such a royalty interest as could arise under the lease, that is, only to the extent and insofar as the 25 acre tract, as well as the whole Van Deventer tract, was subject to the existing lease. The qualifying expressions 'insofar as same affects property herein described,' and 'insofar as it covers the property herein described,' also 'the royalty interest to be received by grantee is the royalty from oil produced from the premises herein described, so far as same is under lease,' can mean only that every undivided interest in the Van Deventer tract and in the 25 acres thereof being sold to the Higgins Company, was not subject to said lease, and that, therefore, the grantors were conveying a royalty interest in the 25 acre tract described in said deed only to the extent and 'insofar as' said lease covered said land, or 'so far as same is under lease.' "

This argument is not sound. The plain import of the language, both of the option agreement and of the Higgins Oil & Fuel Company deed, was that: First, the 72½ acres were to be sold subject to the lease in question, which purported to convey all the interest in the land. For this ratification of the lease by L. Q. Van Deventer as against his one-sixth of the 72½ acres of land, as well as for the other privileges of the option, Mrs. O'Brien paid the grantors $100. We say this because there was nothing in the option contract to suggest that L. Q. Van Deventer was reserving his one-sixth interest as against the

lease nor that he was selling his one-sixth interest to Mrs. O'Brien free of the lease; but by plain language it was the intention of the contract that she should take the land burdened by the lease in all respects as the lease was written. No construction can be given the option contract except that as to the 72½ acres of land L. Q. Van Deventer, for a valuable consideration to him paid, adopted it in all its terms. Second, the same construction must be given the language of the warranty deed in which he joined to the Higgins Oil & Fuel Company. Also, we have the additional fact that on the testimony of his mother he received from her a part of the proceeds of the sale of the 25 acres of land as well as the other lease money, to quote her language, because her children "had an interest in the place." Of course, L. Q. Van Deventer had an interest in the 72½ acres of land and the 25 acres of land, but he had no interest in the lease money except on the theory of ratification. Appellants cannot say that L. Q. Van Deventer joined in the deed to the 25 acres, reserving his interest from the lease and conveying his interest to Higgins Oil & Fuel Company free of the lease, thereby burdening the 25 acres of land, as between Higgins Oil & Fuel Company and appellee, only with the lease as it related to the interest of his mother and sister. Such a construction gives effect neither to the language of the deed nor of the option nor of the lease. These instruments made the deed subject to the lease as written which, by its express language, covered all the interest in the 25 acres. Every circumstance in the case supports the plain import of the language of the deed. Thus, at the time the warranty deed was executed to Higgins Oil & Fuel Company, if L. Q. Van Deventer was not a party to the lease executed by his mother and sister, his undivided one-sixth interest was much more valuable than his sister's interest. All she could convey was her royalty interest in the oil, while L. Q. Van Deventer could convey his oil interest with an unclouded title. Yet, in dividing the proceeds of this sale, he got one-half and his sister one-half, with no explanation as to the division. The only conclusion to be drawn is that he and his mother and sister thought his interest was equal with that of his sister. On the theory of ratification it was equal; but for the ratification it was not equal. Again, it was expressly provided in the option contract "the rental shall be collected by the undersigned." L. Q. Van Deventer was one of "the undersigned."

 As a joint tenant with his mother and sister he had the right to share in the proceeds of the lease, as the lease was written; that is to say, since his mother and sister purported to lease all the land, he had the right to ratify the lease and then share in the consideration paid therefor. This he did, by the plain language of the option contract just quoted. The principles announced in Texas & P. Coal & Oil Co. v. Kirtley (Tex. Civ. App.) 288 S.W. 619, 623, sustain our conclusion that the facts of this case constitute ratification, as a matter of law, against L. Q. Van Deventer. In that case a tenant in common, who had not joined in the execution of the lease in question, did join in executing certain orders for the division of the royalty interest. Construing these orders, it was held that this tenant in common had ratified the lease in question. Discussing the issue of ratification, the court said:

"But if we have not misunderstood the law relating to tenancy in common, it is the rule that where one tenant in common conveys the whole of the property that other tenants in common who ratify or acquiesce are estopped to deny the validity of the conveyance so ratified. In 38 Cyc. title Tenancy in Common, p. 106, the rule is stated:

"'Tenants in Common, being owners of several interests, may ratify the acts of each other and acquiesce therein; and generally such ratification or acquiescence with full knowledge of material facts is effective; and after such ratification or estoppel, or after such ratification or acquiescence the ratifying parties and their grantees are estopped from denying the effect thereof.'

"As supporting this text a large number of cases from different jurisdictions are cited. Most of them relate to the ratification by one tenant in common of the deed of his cotenant conveying a specific parcel of the common property and holding that where such a deed is ratified by a tenant in common he is bound thereby. On page 111 of the same volume of Cyc. as cited last above, there is a further statement:

"'An unauthorized sale or conveyance of the whole property by one tenant in common may be ratified by the others. The nonconsenting tenant may be estopped from denying the passage of title to the vendee if he does any act to ratify or confirm the sale.'

"In Tiffany, on Real Property, vol. 1, p. 682, it is said:

"'A conveyance by a cotenant of a specific portion of the land may, it has been frequently stated, be validated by a ratification thereof by the other cotenants. In so far as this means that in States in which a conveyance by a cotenant of his undivided interest in a specific tract of land is ordinarily invalid as against the other cotenants, it is valid even as against them in case they acquiesce therein, it appears to be a reasonable qualification of the doctrine.'

"To the same effect is the rule as stated in 7 R. C. L. §§ 72, 75 and 77, pp. 877, 879, and 882.

"In section 75, it is there said:

"'A joint tenant or tenants in common cannot sell the whole common property without

the authority of his cotenants; for he has no implied authority to dispose of his cotenant's interest in the common property and any attempt on his part to do so is ineffectual. In case of such a sale a nonassenting tenant has two courses open to him. He may treat the attempted sale of his interest as annulled, and if the grantee refuses to admit him to possession of the premises may bring ejectment and recover such possession, or he may at his election affirm what has been done; and treat the money received for his interest as money received to his use.' * * *

"If one tenant in common assumes to deal with the whole property and to convey the whole of the common property, then his cotenant should certainly have the right to ratify the sale of the property and claim his share of the profits arising from the sale. Further complaint is made of the holding because the opinion acquiesces in the trial court's conclusion of fact that there was no prejudice to appellant and that we have in effect applied the doctrine of estoppel while agreeing with the trial court that one of the main elements was lacking. Ratification is a species of estoppel, and where an act of another has been ratified by the complaining party, the ratifying party is estopped to deny the effect of the act which he has ratified, but change of position is not an essential element of ratification as is required in the application of the rule of estoppel in pais. What we mean to say is that, the uncontradicted facts showing ratification, appellees are thereby estopped to deny the effect of the last lease executed by the Hills and that as relates to this matter prejudice or change of position is not required."

We think the language of the option contract, "the rental shall be collected by the undersigned," brings this case clearly within the construction given the division orders in the case just quoted.

For the reasons stated the judgment of the lower court is reformed and affirmed as it relates to Mrs. Martha Van Deventer and Mrs. Mahavier, and reversed and rendered as it relates to L. Q. Van Deventer on the issues of damages because of the trespass, but affirmed on the issue of title.

Affirmed in part; reformed and affirmed in part; reversed and rendered in part.

### On Rehearing.

On request of appellants, we make the following additional conclusions of fact:

(a) We quote as follows from the lease:

"That we, Martha Van Deventer, a widow, Chas. Mahavier and his wife, Mrs. Nena Mahavier, of Matagorda County, Texas, hereinafter called 'Lessor' (whether one or more) have and by these presents do hereby lease unto the Gulf Production Company, hereinafter styled 'Lessee,' the tract of land hereinafter described, with the right of exploiting the same for, and of producing minerals therefrom, and to that end also grant the exclusive right of drilling and operating thereon for oil, gas, or other minerals, together with rights of way for and the right to lay pipe lines to convey water, oil, steam and gas, and the right to have and use sufficient water, oil, gas and coal from the premises to drill and operate any wells that lessee may bore, or shaft lessee may excavate, or in treating, so as to make merchantable, any of such minerals, and also such other privileges as are reasonably requisite for the conduct of said operations and the right to remove at any time from said premises any and all property which may have been placed thereon by said lessee.

"The said premises as to which this instrument applies are situated in Liberty County, State of Texas, and are described as follows:

"Being the East 145 acres out of 225 acres tract of land out of the David Minchey League, Abstract No. 85, on the East bank of the Trinity River, being all of the land now owned by grantor, in said League, and being all of the 225 acre tract aforesaid except the West 80 acres thereof, heretofore sold by grantor to E. W. Towns for T. A. R. Oil Company.

"To have and to hold, unto the said Lessee, the Gulf Production Company, its successors and assigns, for the term and under the provisions as follows, to-wit:

" * * * Provided if the Lessor shall own less than the entirety of the premises, royalty shall be paid only in the proportion that his ownership is of the whole."

(b) We make the following additional quotations from the testimony of Mrs. Van Deventer, as summarized by appellants in their brief:

"The whole of Mrs. Van Deventer's testimony relating to all of this money, both the cash bonus and the delay rental, is as follows: 'I used the money that I got on the first lease and this second lease, and whenever I thought it was necessary, and they needed it, I gave some of it to Bud and Nena. I do not need money very much. That is all I need that money for, is to help support myself and help support my children.' Then on cross-examination she said: 'I just gave that money like I would any other money that belonged to me; gave to them or bought what I wanted to, just use it like I would any other money that I had, did whatever I pleased with it. I gave money to the children because they had an interest in the place.' When testifying by deposition, in May, 1925, Mrs. Van Deventer was asked how much Townes gave her for the lease executed to him, and she answered that she had forgotten; then the next question was, 'Did you divide that money with Miss Nena?' She answered: 'I used it for my own purpose.' And being asked about such state-

ments at the trial hereof, she answered: 'My memory was fresher then than it was (is) now. That is the purpose I used it for; that is the purpose I had it for, myself and my children.' "

(c) Mrs. Van Deventer, in her testimony, made no mention "of the proceeds of the sale of the twenty-five acres of land." .

(d) Quoting from appellants' supplemental argument on rehearing: "The only testimony regarding that $7500.00 payment was given by L. Q. Van Deventer, and his undisputed testimony is that 'the reason I needed so much money at that time was because I was fixing to get married. I did get married and built my home.' And, further, that his mother 're-ceived all of the consideration mentioned in the deed that we made to the Higgins Oil & Fuel Company. That was paid to her. She gave me half, and Nena Mahavier half.' "

If we have said anything in our original opinion conflicting with conclusions (c) and (d), the same is hereby withdrawn.

(e) On page 83 of their original brief, appellants inserted the following note: "Note: In discussing the succeeding propositions, we will, at times, be dealing with the rights of Mrs. Mahavier as affected by the judgment which the court has rendered upon the theory that Mrs. Mahavier ratified the lease. But in all that we may say, it must be understood that Mrs. Mahavier is still insisting upon the contention, as pleaded by her, that the lease as to her is null and void, and that she does not acquiesce in the court's holding that she ratified the lease, but that holding she continues to insist is erroneous, and, as stated, everything hereinafter said with reference to her rights under the lease is intended to be and must be considered as being within the purview and protection of her alternative plea." The quotation from appellants' brief given in our original opinion, summarizing certain facts regarding Mrs. Mahavier's attack on her lease, was taken from pages 371 and 372 of her brief. Because this quotation followed her "note," she now insists "that the court had no right to make any use of the quoted extract in holding against Mrs. Mahavier on her claim for damages because of the wrongful and unwarranted entry upon her interest in this land." We did not make this quotation seeking to bind Mrs. Mahavier by an alternative proposition of law, but, as the quotation contained an unqualified admission of certain facts, we accepted it as such and attempted to construe the legal effect of such facts as an original proposition and not, as we have just said, upon the theory of an alternative proposition advanced by Mrs. Mahavier.

Appellants assign error against our refusal to reverse the judgment of the lower court and to remand the cause for a new trial upon their issues relating to "the wedge." Appel-

lee pleaded that "the wedge" was included in the lease by mutual mistake. The evidence sustained this pleading as a matter of law. Because the issue of mistake was presented by appellee as "strictly a defensive pleading and affirmative action was sought on that plea," appellee insisted in its original brief, filed herein, that the trial court correctly excluded "the wedge" from the lease, even after it had been exploited for oil. In support of this plea appellee cited Mason v. Peterson (Tex. Com. App.) 250 S. W. 142, and Moore v. Hazelwood, 67 Tex. 624, 4 S. W. 215. We overruled this proposition on the theory that appellee could not release "the wedge" from its lease without compensating appellants for the damages done thereto; and on the theory that the verdict of the jury correctly estimated the damages done to "the wedge," we reformed the judgment of the lower court by giving Mrs. Van Deventer and Mrs. Mahavier compensation for the drainage. Appellants now insist that the judgment, as reformed in their favor, does not afford them full compensation. We think the following quotations from their original brief fully answer this contention, and sustain our conclusion that the judgment rendered by us does full equity between the parties. Appellants said:

"And even though it may be said that the plea of mutual mistake was simply urged in defense, relief of an equitable nature was sought thereby and could be granted only on condition that the lessee should first place the lessors in statu quo. And to do that, the trial court, on giving effect to defendant's plea of mutual mistake, should have rendered judgment in favor of the plaintiffs, Mrs. Van Deventer and Mrs. Mahavier, against the Gulf Production Company, for the value of their proper proportionate share of the oil drained by defendant from under their land.

" * * * As we have seen, the total drainage, as found by the jury, from under the whole Van Deventer tract, inclusive of the wedge, was 88,743 barrels of oil, and of this amount 13,800 barrels were drained through Antoine No. 1, and 74,943 barrels through Antoine No. 3 and Duessen No. 11. Therefore, in order to place these two plaintiffs in statu quo, the judgment in their favor because of such drainage should have been calculated upon this basis.

" * * * Hence, the judgment in favor of Mrs. Van Deventer upon this drainage account, instead of being for only the sum of $1,725.00, the amount for which the court did render judgment in her favor, should have been $11,092.50. Mrs. Mahavier's interest was one-sixth of one-eighth, or one forty-eighth, this being one-fourth as much as her mother was entitled to, therefore the amount due her was $2,773.12.

" * * * All this helps to make it clear that the appellants are not desirous of inflict-

ing an injustice on the appellee company, but only ask that said company be held responsible for its own wilful misconduct, and upon the count we are now discussing, we submit that if the trial court in any event, was authorized to hold that the wedge strip was embraced within the lease as the result of a mutual mistake, it should further have held that said strip cannot at this late day be excluded from the lease without first placing Mrs. Van Deventer and Mrs. Mahavier in statu quo, and therefore, in that event, they would be entitled to judgment against appellee calculated upon the total drainage as found by the jury, in the respective amounts hereinabove shown, that is, Mrs. Van Deventer for the sum of $11,092.50 and Mrs. Mahavier for the sum of $2,773.12."

Again, we say it is not our intention, by thus quoting from appellants' brief, to bind them by an alternative proposition, but, as these quotations purport to state the equities of this case, and we think correctly summarize the law, we simply adopt them as an answer to appellants' assignments under discussion. In United States & Mexican Trust Co. v. Delaware W. Construction Co., 112 S. W. 447, at page 461, speaking for the Texarkana Court of Civil Appeals, Judge Hodges said: "No principle is better settled than that he who would escape the rigors of the law, by a resort to equity, must not himself invoke the rules from which he flees."

Concluding this opinion on rehearing, it is proper to say that we have given the most painstaking consideration to appellants' many interesting assignments against our opinion. We heard the motion for rehearing on oral argument, and appellants have supported their motion by two able and interesting written arguments. Having carefully reviewed these propositions, and checked them against what we have said in our original opinion, we cannot escape the conclusion that we have correctly disposed of this case. The motion for rehearing is, therefore, in all things overruled.

HIGHTOWER, C. J.

I agree with the conclusion reached by Judge WALKER, that appellants' motion for rehearing should be overruled. I have no doubt of the correctness of our holding on any point save the contention made by appellant L. Q. Van Deventer that we were in error in holding that his record shows, as a matter of law, that he ratified the mineral lease executed by his mother and sister to the Gulf Production Company, dated January 19, 1920. As to this contention, the exhaustive and strong written argument presented by counsel for the motion has caused some doubt. In the light of this argument, I have again reviewed the record, and still conclude that our original opinion on this point was correct.