## LEOPARD et ux. v. STANOLIND OIL & GAS CO. et al.

### No. 14004.

Court of Civil Appeals of Texas. Dallas.

April 8, 1949.

Rehearing Denied May 6, 1949.

John D. Glass, of Tyler, for appellants.

Carlton R. Winn and Lon Sailers, both of Dallas, and John Dowdy, of Athens, for appellees.

CRAMER, Justice.

Appellants, plaintiffs below, sought a judgment decreeing null and void, for nonpayment of delay rentals and nondevelopment, a lease covering oil, gas and all other minerals, and to recover, free of such lease, a tract of 70 acres of land in the S. Sylvester Survey in Henderson County, Texas, plus damages for failure to release; and adversely claiming under said lease.

It was admitted that appellants own the surface rights and a fractional part of the royalty, and that appellees hold only such rights, if any, as they may now possess under an oil, gas and all other minerals lease dated September 30, 1943. Appellants asserted that the lease, expressly and without ambiguity, provided that no unit or pool thereof should exceed 40 acres in area, and that, since appellees paid no delay rentals for the year beginning February 16, 1946, and no well had been commenced on said land, nor on any unit or pool thereof not exceeding 40 acres in area, the lease became null and void on February 16, 1946.

Appellees asserted that the lease was in force by reason of (1) its having been unitized with other leases as provided for in the lease; (2) the existence of a producing well on said unit; (3) appellees' delivery, and appellants' acceptance of, checks covering appellants' portion of the royalty in said unit, the acceptance of said checks constituting a ratification of the lease and its unitization; (4) and appellants' ratification of the lease and its unitization, by the execution of a royalty deed (after the unitization of said lease and the acceptance of royalty checks thereunder) reciting that it was subject to an oil and gas lease.

The trial was to a jury and at the conclusion of plaintiffs' testimony, appellees' motion for an instructed verdict was sustained and judgment rendered accordingly.

It is undisputed that on September 30, 1943, Stanolind Oil & Gas Company and John R. Black held and owned, by assignment through the original grantee therein, J. W. Lindley, a valid oil and gas lease, without a unitization clause therein, on the 70-acre tract involved herein, which lease ran for a primary term of 10 years and 4 months. On September 30, 1943 this lease had 4 months and 16 days to run before its expiration date; and, under other provisions, by drilling thereon, would have continued in force so long as oil, gas or other minerals were produced from said land. At that time this Country was at War. Materials were scarce. The R. F. Holland No. 1 gas well had already been drilled and was producing gas. W. F. Leopard testified he knew it was producing gas (S. F. p. 109). He further testified that it was about 410 (3 ft.) steps (less than a quarter of a mile) from his home (S. F. p. 81). The new lease in question was executed September 30, 1943, and a $3,500 consideration paid to appellants. The material points of the lease are paragraphs 1-a and 4, thereof, which have to do with the right of appellees to unitize such lease with other leases. On the first page of the lease, all in typewriting, is paragraph 1-a which reads as follows:

"Lessee is hereby given authority to pool, unitize or combine all or any part of the land covered by this lease in so far as the gas and gas rights are concerned, at any time and from time to time, with any other land, lease or leases, when, in the judgment of Lessee, it is advisable to do so in order properly to develop and operate said premises, or to comply with any federal or state law, order, rule or regulation, or to establish units for recycling or other auxiliary production purposes. If gas production is found on such unitized acreage, it shall be treated as if production is had from the land covered by this lease, whether or not the well or wells be located on the above described premises. If gas production is obtained from the above described land or from any land with which it is pooled, unitized or combined, then, in lieu of the gas royalty hereinabove provided for, Lessor shall receive, as royalty on gas produced from the unitized area, that portion of the royalty herein specified as the amount of the above described acreage placed in any unit or combination bears to the Total amount of acreage at any time unitized, pooled or combined."

On page 2 of the lease, in printing (except for the figure 40, indicated here by underscoring, which was inserted by typewriter), is paragraph 4, as follows:

"Lessee is hereby given the right and power to pool or combine the land covered by this lease or any portion thereof with any other land, lease or leases when in Lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said premises, provided that no unit so created shall exceed 40 acres in area. If production is found on the pooled acreage, it shall be treated as if production is had from this lease whether the well or wells be located on the premises covered by this lease or not. In lieu of the royalties elsewhere herein specified, Lessor shall receive on production from a unit so pooled only such portion of the royalty stipulated herein as the amount of his acreage placed in the unit or his royalty interest therein bears to the total acreage so pooled in the particular unit involved."

It was undisputed that the pool or unit appellees created exceeded 40 acres, and that the $70 covering the February 16, 1946 rental was not paid. The lease, among other usual provisions, recited the primary term to be five years from February 16, 1944. On October 26, 1943, Stanolind, as Operator, filed its first notice of unitization to cover "Unit B." On February 29, 1944, it filed its amended notice of unitization covering "Unit B." The first notice *did not include* the Leopard tract. The second notice *did include* the Leopard tract. The amended notice was filed for record March 3rd, 1944, and recorded March 28, 1944, in Vol. 274 at page 423 of the Deed Records of Henderson County, Texas. (Defendants' exhibit No. 114.) On March 30, 1944, appellee, Stanolind, wrote appellant and wife a form letter headed "Tri-Cities Unit B" to which was attached a printed unitization agreement, an amended lease form and a

division order. The division order specified the R. F. Holland, Floyd Goodgame, Carl Werneking, R. C. Roberts and W. F. Leopard farms or tracts. The attached multigraphed list covered both sides of two legal-size sheets, and listed the ownership and division of proceeds of oil between the parties. The last farm listed is that of appellants, and is at the bottom of the back of the second sheet, being page 4, and reads as follows:

"Effective March 1, 1944, the Following Farm Will Become a Part of Unit 'B' #14735—W. F. Leopard Farm'

| | | |
|---|---|---|
| Stanolind Oil & Gas Company | 5/70 | of .1126770 of 1/8 R.I. |
| Carl Short | 1/4 | of .1126770 of 1/8 R.I. |
| W. D. Puterbaugh | 28.75/70 | of .1126770 of 1/8 R.I. |
| W. F. Leopard and wife | 18.75/70 | of .1126770 of 1/8 R.I." |

After a follow-up letter from appellees, appellants wrote appellees (by typing on the bottom of appellants' letter) on May 11, 1944, as follows:

"Referring to your above letter, the reason I have not executed the instruments you sent me, is I have some term royalty sold that will expire about Sept. 3rd, 1944, and if you can assure me that signing papers will in no way extend my royalty I am willing to sign same. Yours truly (signed) W. F. Leopard. Athens, Texas, R. F. D. No. 1."

The record shows that on March 3, 1944, appellants had transferred to Carl Short ¼ of their ⅛ royalty, for a period of time expiring September 3rd, 1944. On September 14, 1944, appellants wrote appellees as follows:

"In reply to Your letter just received, This is to advise You that we do not care to sign the division order that was submitted to us as of Aug. 30th, 1944, for the following reason, Carl Short interest in this division order expired the 3rd day of March of this year, and had 6 Mo. grace, We will sign division order, if You will include the interest you have set up in the division order, for Carl Short for Our credit."

Fifty-three royalty checks, dated from March 27, 1945, to July 25, 1947, were sent to and cashed by appellants, in total amount of $673.87. The correspondence shows that appellants knew the checks were from the Holland Well from which "Unit B" royalty checks were paid. On November 5, 1947, Stanolind wrote Leopard as follows:

"We have your letter of November 2, 1947, respecting your royalty payments under the W. F. Leopard Farm. Our file shows that on receipt of the letter from Mr. Albert Wooley, Clarksville, Texas, dated June 26, 1947, and enclosing a royalty deed from W. F. Leopard and Mineola Leopard, his wife, to Nowlin Watson, your interest under the W. F. Leopard Farm was placed in suspense and transfer orders were sent to Mr. Wooley so that he could obtain the signatures of all interested persons. We have written him several times since then endeavoring to obtain the transfer orders so that all interests might be placed in line for payment, but we have not yet received the executed transfer orders. We are informed that these transfer orders were mailed to you but that they were never returned. We therefore ask that you please see that the transfer orders are sent to this office as soon as possible so that we can place all interests in line for payment. Yours very truly, /s/ C. A. Markey, cc-Mr. Albert Wooley, Clarksville, Texas."

On November 10, 1947, appellants wrote appellees as follows:

"Stanolind Oil and Gas Company. Kind Sir. In answer to your letter of Nov. 5, 1947—Yes we sold Mr. Albert Wooley the Roylty, in good faith. And we told him we would not sign any more papers. so he said we would not have to sign anything else. so we are not going to sign any—and we got our pay right on until two months ago. and you have not paid our rendal like our contract called for. We was to get a Dollar an acer rendal. So we have not got our rendal in Over 20 months. * * * We are in production and you have not stood up to your contract. and we are now asking you for a release on our Lease. Yours truly Mr. and Mrs. W. F. Leopard Athens Tex. Route One."

Appellees answered that letter as follows:

"Mr. W. F. Leopard Route #1 Athens, Texas Dear Sir: We have your letter of November 10, 1947, saying that you sold the 8-acre royalty interest to Mr. Nowlin Watson, Clarkesville, Texas, but that you do not wish to sign the transfer order. We are, therefore, placing the interests in line for payment without signed transfer orders, effective June 1, 1947, as follows: W. F. Leopard and wife 10.75/70 of .1126770 of ⅛ R. I. Nowlin Watson 8/70 of .1126770 of ⅛ R. I. The W. F. Leopard Farm is a part of Tri-Cities Unit 'B' (gas unit), and the leases within the Unit are held by production from the unit. We are at a loss, therefore, to understand your remarks respecting rentals. Yours very truly, /s/ C. A. Markey. WHJ:eml cc-Mr. Albert Wooley Clarksville, Texas * * *."

Appellant W. F. Leopard testified that his wife wrote this letter and he knew about it at the time she was writing it; that he knew the 53 checks he cashed were for production from the Holland Well, and that he had no well on his 70-acre tract.

A careful reading of the lease discloses that paragraph 1(a) covers only gas and gas rights, while paragraph 4 covers all oil, gas and other minerals. The two provisions conflict as to gas and gas rights, but it is only necessary to apply the rule of construction that special provisions control over general provisions of a contract where they are in conflict, to arrive at a conclusion that paragraph 1(a) controls as to gas and gas rights, while paragraph 4 controls as to oil and all other minerals. However, whether the 40-acre limitation contained in paragraph 4 of the lease applies to only oil and other minerals, or is a limitation as to all minerals, is not clear from a reading of the lease alone, and, without the other facts in the record, might appear to be ambiguous. But, taken with all the evidence, it is clear that, as to gas rights, the 40-acre limitation is not applicable.

A construction should be given to the lease which does not give violence to its terms, and, at the same time, gives force to the real intent of the parties to the instrument. Of course, if the contract is plain and unambiguous, and all rights of the parties are clear, plain and can be given only one construction (in the absence of any claim of fraud, accident or mistake, which is not an issue here), parol evidence is not admissible to vary the terms of the contract. But that is not the case here. In the case of Ryan v. Kent, Tex.Com.App., 36 S.W.2d 1007, a prior lease was in existence and a new lease was executed to straighten out the royalty provision. Judge Leddy, in his opinion, quoted the rule applicable here, from Reed v. Merchants Mut. Ins. Co., 95 U.S. 23, 24 L.Ed. 348, as follows:

"A clear statement of this rule is that made in Reed v. Merchants Mut. Insurance Co., 95 U.S. 23, 30, 24 L.Ed. 348, wherein the court said: 'Although a written agreement cannot be varied (by addition or subtraction) by proof of circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities. * * * "It may, and indeed it often does, happen, that, in consequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different from what it would have received, had it been considered in the abstract. But this is only just and proper; since the effect of the evidence is not to vary the language employed, but merely to explain the sense in which the writer understood it." ' " [36 S.W.2d 1010]

In another opinion Judge Leddy, in Colquitt v. Eureka Producing Co., Tex.Com. App., 63 S.W.2d 1018, 1021, stated:

"If the language of this instrument is fairly susceptible of more than one interpretation, it is the duty of a court in de-

termining the true intent of the parties to consider the surrounding circumstances existing when the deed was executed, Lipscomb v. Fuqua, 103 Tex. 585, 131 S.W. 1061; Ryan v. Kent, Tex.Com.App., 36 S. W.2d 1007, and this regardless of whether the language used be ambiguous, Ryan v. Kent, supra. The consideration of such extraneous evidence is not to vary or contradict the terms of the instrument but to aid the court in arriving at the true intention of the parties. Reed v. Merchants Mut. Ins. Co., 95 U.S. 23, 24 L.Ed. 348; French v. Carhart, 1 N.Y. [96] 102; Bradley v. Washington, Alexandria & Georgetown Steam Packet Co., 13 Pet. 89, 10 L.Ed. 72; Borden v. Patterson, 51 Tex.Civ.App. 173, 111 S. W. 182."

See also State National Bank v. Morgan, 135 Tex. 509, 143 S.W.2d 757.

■ We therefore hold that the intention of the parties was that the gas and gas rights, as distinguished from oil and other minerals, could be unitized with land in excess of 40 acres, and that the 40-acre limitation in paragraph 4 of the lease applied only to oil and other minerals.

■ This is consistent with the terms of the instrument itself, and, since intent is purpose formed in man's mind, it carries out the undisputed purpose of the parties, as evidenced by all their acts, and gives both paragraphs, 1(a) and 4, proper effect.

■ The acceptance of the royalty checks by appellants with knowledge that they were in payment for royalty from the Holland Well and that the Holland Well and their land, together with other lands of third parties had been unitized by appellees, was a ratification of such unitization by appellees.

In Bearden v. Texas Co., Tex.Civ.App., 41 S.W.2d 447, at page 464 on motion for rehearing, affirmed on other grounds, Tex. Com.App., 60 S.W.2d 1031, Justice Dunklin stated:

"But we adhere to our former conclusion that the defense of estoppel as against Bessie Lee Griffin was conclusively established by her act in receiving from her former guardian on final settlement of the guardianship after her marriage, several thousand dollars collected by him as royalties from the lease which was assailed by her; and further receipts of royalties by her after her marriage in monthly installments covering more than a year, amounting to more than $1,000, since such acts conclusively bound her to a ratification of the lease and of the judicial proceedings which culminated in its execution."

See also Texas Co. v. McMillan, D.C., 13 F.Supp. 407, 408, where Judge Atwell held:

"The McMillans, after acquiring royalty rights from the vendors of complainant (the Texas Company), received payments from the complainant (Texas Company) upon such portion of the lands as were developed. Such acquisition and acceptance of benefits by them from the complainant places them in the attitude of having recognized, confirmed, and ratified the title of the complainant, and they are estopped to deny its estate. Texas & Pacific Coal & Oil Co. v. Kirtley, Tex.Civ. App., 288 S.W. 619; 2 Story, Eq.Jur. (13th Ed.), § 180; Fox v. Windes, 127 Mo. 502, 30 S.W. 323, 48 Am.St.Rep. 648; Bearden v. Texas Co., Tex.Civ.App., 41 S.W.2d 447; Jones v. Patterson, 307 Mo. 462, 271 S.W. 370; Schloss Bros. & Co. v. [Charles] Stern Co., 5 Cir., 53 F.2d 574; Wilson v. Union Electric Light & Power Co., 8 Cir., 59 F.2d 580. * * * In Gibson v. Lyon, 115 U.S. 439, 6 S.Ct. 129, 133, 29 L.Ed. 440, it was said that: 'He (a person) certainly cannot be permitted to claim both under and against the same deed; to insist upon its efficacy to confer a benefit and repudiate a burden with which it is qualified is to affirm a part and reject a part.'"

■ In addition to the above, appellants ratified the lease and its unitization on May 7, 1947, when they executed to Nowlin Watson "an undivided eight-acre interest in and to all of the oil royalty, gas royalty, and royalty in casinghead gas, gasoline, and royalty in other minerals in and under," etc., the 70-acre tract and in which deed the following paragraph appeared, to wit:

"Said lands or portions thereof, being now under oil and gas lease executed in favor of any valid lease of record it is understood and agreed that this sale is

made subject to the terms of said lease, but covers and includes the same interest as first hereinabove named, of all oil royalty and gas royalty and casinghead gas and gasoline royalty, and royalty from other minerals or products, due and to be paid under the terms of said lease."

At page 143-b (lines 1 to 11 inclusive) of the statement of facts is the following: "Plaintiffs now offer in evidence all of paragraph 4 of the stipulation, and is as follows: 'The above sums of money were paid or tendered to W. F. Leopard and wife, Mineola Leopard, on the basis of the assumption of their owning an 18.75/70 of .1126770 of 1/8 of the royalty, or a total of .003727, until May 31, 1947. Effective June 1, 1947, and until the present time, W. F. Leopard and wife, Mineola Leopard, have been paid 10.75/70 of .1126770 of 1/8 royalty, or a total of .0021630; and Nowlin Watson has been paid 8/70 of .1126770 of 1/8 royalty, or .0016097.' "

█ The lease was on the homestead property of the appellants and appellants asserted that there can be no ratification of a lease except by an instrument acknowledged as required by conveyances of homesteads. This is correct, but the original lease, the present lease and the royalty deed to Nowlin Watson were all properly acknowledged by appellants as required of such instruments when affecting the homestead (S.F. 39). In Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619, 623, the Supreme Court of Texas held that leases which were originally executed by husbands alone, without joinder or acknowledgment of any kind by their wives, could be and were ratified by the wives when they joined with their husbands in the execution of a royalty conveyance, using the following language:

"Under the law the Welch lease was inoperative as to Taylor and Frank Anderson and their wives, and the power to make it operative rested exclusively with them. They exercised that power freely and voluntarily. They did not repudiate the Welch lease. On the contrary, a recognition of the lease was made in deeds executed by them in strict conformity with law, and the benefits arising therefrom

accepted. By their acts in executing the royalty deeds above described, they gave the lease life. Their acts constituted a ratification of the lease. The purposes of the statutes have been fully met. The rights of the parties acquired thereunder became valid and binding. After they have ratified the Welch lease in the manner described above, it is not the policy of the law to permit a repudiation thereof. For a discussion of the general principles of ratification applied by the courts of this state, see Humble Oil & Ref. Co. v. Davis, Tex.Civ.App., 282 S.W. 930; Ascarete v. Pfaff, 34 Tex.Civ.App. 375, 78 S.W. 974; Van Deventer v. Gulf Production Co., Tex.Civ.App., 41 S.W.2d 1029 (writ refused); Buvens et al. v. Brown, 118 Tex. 551, 18 S.W.2d 1057."

Appellants therefore ratified the unitization of the lease by said provision in such royalty deed, properly acknowledged by appellants, at a time when they were receiving and cashing checks for royalty under the unitization agreement and under the lease. They cashed check dated 6–18–47 at the Piggly-Wiggly store in Athens June 23, 1947; check dated 6–25–47 on June 30, 1947; check dated 7–25–47 at the First National Bank of Athens August 16, 1947. See also Reserve Petroleum Co. et al. v. Hodge, Tex.Sup., 213 S.W.2d 456, and cases there cited.

It follows that there was no issue of fact for the jury and that the trial court properly instructed a verdict for appellees, and should be affirmed.

YOUNG, J., concurs.

BOND, C. J., dissents.

BOND, Chief Justice (dissenting).

I am not in accord with the majority's construction of the lease dated September 30, 1943, the pertinent parts of which are quoted in the majority opinion; only such portion shall be here restated as bears on the question involved. The lease executed by appellants to Stanolind Oil & Gas Company was for the purpose of "investigating, exploring, prospecting, drilling and mining for and producing *oil, gas and all other minerals,*" etc.; and the land included in

the lease is .70 acres more or less, owned, occupied and used by W. F. Leopard and wife Mineola Leopard as their homestead (Emphasis mine).

The lease provides among other things (section 1-a): "Lessee is hereby given authority and the power to unitize or combine all or any part of the land covered by this lease in so·far as the *gas and gas rights are concerned,* at any time and from time to time, with any other land, lease or leases, when, in the judgment of Lessee it is advisable to do so in order properly to develop and operate said premises, * * * or to establish units for recycling or other auxiliary production purposes ` * * *. 2. Subject to the other provisions herein contained, this lease shall be for a term of five (5) years from February 16, 1944 (called 'primary term') and as long thereafter as *oil, gas or other minerals* is produced from said land or on any acreage pooled therewith hereunder, or drilling or reworking operations are conducted on said land or on acreage pooled herewith. * * * 4. Lessee is hereby given the right and power to pool or combine the land covered by this lease or any portion thereof with any other land, lease or leases when in Lessee's judgment it is necessary or advisable to do so in order to properly develop and operate said premises, *provided that no unit so created shall exceed 40 acres in area.* * * *. 5. If operations for drilling are not commenced on said land or on acreage *pooled therewith as above provided* on or before one year from February 16, 1944, the lease shall then terminate as to both parties, unless on or before such date Lessee shall pay or tender to Lessor or to the credit of Lessor in the First National Bank at Athens, Texas (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals either by conveyance or by the death or incapacity of Lessors) the sum of Seventy and no/100 ($70.00) Dollars (herein called rental), which shall cover the privilege of deferring commencement of operation or drilling for a period of tweve (12) months * * *." (Emphasis mine.)

It will readily be seen that section 1-a and section 4, in duplication, give to the lessee the right and power to ·unitize the leased premises "subject to other provisions" therein contained (section 2), and "no unit so created shall exceed 40 acres in area" (section 4). Evidently the "40 acres in area" is an express limitation on lessee's right to pool or unitize lessors' land with other land, lease, or leases. Indeed the lessee had the undoubted right, twofold, to unitize the leased premises; subject, however, to the limitation provided in the lease —a most valuable limitation protecting lessors' rights therein. Section 1(a), typewritten in the printed lease form, gave to lessee no greater right, or extended additional privileges, than were given and provided in section 4. The mere fact that one provision (1-a) is written in with a typewriter, and the other (section 4) printed, gives to the typewritten section no greater legal prominence than is given to the printed section. It is the language employed in a contract that gives legal effect to the powers extended. I can not conceive of any canon of construction of two analogous provisions in a contract, one granting power to unitize for the purpose of mining for "gas and gas products," and the other for oil, gas and other minerals, as to make the two provisions ambiguous to admit proffered parol evidence in aid to interpretation; or that would give to the typewritten provision (1-a) an interpretation as being a specific grant of unitization, and to the printed provision a general grant. While, in the case at bar, the typewritten provision relates to unitization for the purpose of drilling, mining, etc., for "gas and gas rights," and the printed provision relates to unitization of the lease to drill, mine, etc., for "oil, gas and all other minerals," neither provision gives unlimited power to the lessee to unitize plaintiffs' land for any purpose, except in units created not to "exceed 40 acres in area." Each of the provisions is expressly made "subject to all provisions contained in the contract" and limited to the provision that "no unit so created shall exceed 40 acres in area."

Generally, it may be said that it is proper, as touching the interpretation of contracts,

to view the construction placed thereon by the contracting parties themselves, and that, too, before any controversy arises. On March 30, 1944, Stanolind Oil & Gas Company, from its headquarters in Tulsa, Oklahoma, addressed a letter to Mr. Leopard advising him of the unitization of their lands with others, covering its "#45719 Unit B," and enclosed a division order and an *amended and modified oil and gas lease,* and urged their execution by appellants. This amended and modified lease was for the express purpose of mining and producing *"oil and gas,"*—amendatory to the original lease of September 30, 1943, authorizing and empowering the lessee to unitize appellants' land or any part thereof by unlimited unitization "with any other lease, leases or unleased mineral interest lying within the area, so as to form by such unitization a unit or units for the production of ˜as * * *," and providing further the.. .in that the "lessee shall also have the right hereunder to reduce the size of any such unit or units if a lease or interest therein which was a part of such unit or units expires or otherwise terminates, * * *." Along with said amended and modified lease, the Stanolind Oil & Gas Company addressed a form letter to Mr. Leopard requesting that he and his wife execute the instruments, and to "guarantee and warrant that they are entitled to receive payment of royalty in the proportion set out opposite their respective names in the attached schedule on all gas and its products produced and sold from that certain area designated as 'Unit B,' containing 524.47 acres more or less." The record here discloses that Mr. and Mrs. Leopard persistently refused to execute the aforesaid amendment and modification of their original lease and refused to guarantee and warrant payment of royalty on the unitized leases mentioned therein. Then, on May 5, 1944, Stanolind Oil & Gas Company again wrote Mr. Leopard: "Please refer to our letter of March 30, 1944, and advise us when we may expect execution and return of the papers as therein requested, covering the above captioned unit" ("#45719 Tri-Cities Unit 'B', Henderson County, Texas") ; then on July 17, 1944, Stanolind

Company again wrote Mr. Leopard: "You have returned to us our letter of May 5, 1944, wherein we requested that you please execute and return to us the division order and certain papers forwarded with our letter of March 30, 1944. * * *, we should appreciate it very much if you will please consider this matter further and advise us as to your decision in the matter"; and on September 11, 1944, Stanolind again wrote Mr. Leopard: "Please refer to our letter to you dated June 17, 1944, and advise us when we may expect the information as therein requested concerning the above captioned unit" ("#45719 Tri-Cities Unit 'B' "). It is clear, I think, that the Stanolind Company recognized the limitation placed on its power to unitize appellants' land with other land, lease or leases in acreage more than 40 acres in area, and that it interpreted the original lease as giving it no such unlimited power, hence necessary to secure the extended amendment and modification of the lease.

It is undisputed, as shown from the record and reflected in the majority opinion, that the proposed unitization of appellants' land with lessee's Unit "B" was outside the group or pool of land and leases originally combined; and that Unit "B" created a separate unit in excess of 40 acres in area. And it is further undisputed that the rental of $70 covering the year of 1946 was never paid; and no operation for drilling was commenced on said land or on acreage "pooled therewith" as required in section 5 of the original lease of September 30, 1943. Hence under the very terms of the lease here involved, the rights therein terminated.

Therefore the lease of September 30, 1943, having terminated, and the amended and modified lease not executed, we need not labor further on the question of waiver or ratification of the unitization of appellants' homestead. The amendment and modification instrument was never executed by Mr. and Mrs. Leopard to become a binding lease against them and their homestead; and the Oil Company operations off the original pool or combine did not prevent termination of plaintiffs' lease for failure to begin operation or pay rentals as

provided therein. The Stanolind Company was bound to unitize the group of land, lease or leases, not in excess of 40 acres in area; thus, viewing their action in the premises, the question forcibly presents itself: If the Stanolind Oil & Gas Company had an unbridled, unlimited power to unitize appellants' land under the rights granted in section 1-a, supra, of the lease involved, with any and all lands, as contended in this lawsuit, then why did it urgently seek to have appellants to execute the amended and modified lease to include and extend such right? It is evident that they had no such unlimited right, and that they did not think they had such right. Without such right, manifestly, they cannot claim a waiver, estoppel or ratification of that which never had existed. If the Oil & Gas Company gave Mr. Leopard money as royalty from production of oil, gas and gas products from land, lease or leases off the area, in a pool or unit, in which appellants' land was not a part, such artifice, in an effort to secure that which was never intended, cannot give rise in defense of plaintiffs' cause of action.

I reluctantly differ with the conclusion reached by the majority, feeling that plaintiffs' land should be cleared of the cloud thereon on account of the terminated lease involved; and that the judgment of the court below should be reversed and here rendered in favor of the appellants.