# IN THE SUPREME COURT OF TEXAS

No. 19-0567

BPX OPERATING COMPANY, BPX PROPERTIES (NA) LP, SEGUNDO NAVARRO DRILLING, LTD., FIRST ROCK OF I, LLC, EF NON-OP, LLC, AND SOUTH TEXAS SHALE, LLC, PETITIONERS,

v.

MARGARET ANN STRICKHAUSEN, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

JUSTICE BOYD, joined by CHIEF JUSTICE HECHT, JUSTICE BLAND, and JUSTICE HUDDLE, dissenting.

When it comes to determining a person's intent, the law has long recognized that actions may speak louder than words.[1] Just as words can create and define an *express* contract,[2] actions can create and define an *implied* contract.[3] In this case, the words of Margaret Strickhausen's oil-

---

[1] *See In re Occidental Chem. Corp.*, 561 S.W.3d 146, 158–59 (Tex. 2018) (orig. proceeding) ("Actions speak louder than words."); *Republic v. Skidmore (Tex. 1845)*, 65 Texas L. Rev. 441, 443 (Paulsen rep. 1986) ("Nor can much reliance be placed on his loose and idle declarations, that he intended to return to Texas. Actions speak louder than words."); *see also Honig v. Doe*, 484 U.S. 305, 319 n.6 (1988) ("[W]e believe respondent's actions over the course of the last seven years speak louder than his counsel's momentary equivocation during oral argument."); *Colonial Refrigerated Transp., Inc. v. Mitchell*, 403 F.2d 541, 549 (5th Cir. 1968) ("In law, as elsewhere, actions may speak louder than words."); RESTATEMENT (THIRD) OF AGENCY § 1.03 cmt. e (AM. L. INST. 2006) ("For example, if a lawyer accepts a retainer and files a complaint on behalf of a person, a client-lawyer relationship results although the lawyer has disclaimed in writing any intention to have such a relationship. Actions may speak louder than words.").

[2] *Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 743–44 (Tex. 2020); *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

[3] *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019).

and-gas lease prohibited BPX from pooling and commingling without her written consent. After BPX breached that provision, it asked Strickhausen to ratify a pooling agreement. She refused at first. But then she accepted and retained a series of substantial royalty payments she knew were calculated and paid based on the commingled production from the pooled unit. Based on our clear precedent, Strickhausen's actions spoke louder than her words. In light of this summary-judgment record, I would hold as a matter of law that Strickhausen impliedly ratified the pooling agreement by accepting the benefits of that agreement, despite her prior protest. Because the Court does not, I respectfully dissent.

## I.
## Implied Ratification

Ratification is an agreement by one party to be bound by the prior, unauthorized act of another. *Dillingham v. Anthony*, 11 S.W. 139, 142 (Tex. 1889); *Cox v. Hous. & T.C. Ry. Co.*, 4 S.W. 455, 458 (Tex. 1887).[4] A party may expressly ratify a prior act through written or spoken words, but it may also impliedly ratify the act by its conduct. *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967). Implied ratification occurs when a person (1) has knowledge of all the material facts regarding a prior, unauthorized act, and (2) engages in conduct that demonstrates an intent to retroactively authorize the act or that is inconsistent with an intent

---

[4] *See also Ratification*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done . . . . A person's binding adoption of an act already completed but either not done in a way that originally produced a legal obligation or done by a third party having at the time no authority to act as the person's agent . . . .").

2

to reject it. *See Rosenbaum v. Tex. Bldg. & Mortg. Co.*, 167 S.W.2d 506, 508 (Tex. [Comm'n Op.] 1943).[5]

A party who is fraudulently induced to enter into a contract will impliedly ratify the contract by, for example, accepting benefits under the contract after the party obtains knowledge of the fraud. *Id.* An act that confirms the validity of the contract or that is inconsistent with an intent to reject the contract will preclude any right of rescission as if the party had expressly ratified it. *Id.*[6] The "critical factor" in determining whether a person has impliedly ratified an unauthorized act is the person's "knowledge of the transaction and his actions in light of such knowledge." *F.M. Stigler*, 609 S.W.2d at 756. In the absence of a disputed material fact, implied ratification may be conclusively established and decided as a question of law. *Country Hollow Joint Venture v. Enter. Cap. Co., N.V.*, 979 F.2d 1534, 1992 WL 352653, at *5 (5th Cir. 1992) (applying Texas law).

We recently confirmed that "[a]ny act inconsistent with an intent to avoid a contract has the effect of ratifying the contract." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 66 (Tex. 2015) (quoting *Bob Montgomery Chevrolet, Inc. v. Dent Zone Cos.*, 409 S.W.3d 181, 195 (Tex. App.—Dallas 2013, no pet.)).[7] And we long ago confirmed that a royalty owner will

---

[5] *See also Willis v. Donnelly*, 199 S.W.3d 262, 271 n.9 (Tex. 2006); *Land Title Co. of Dall., Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980); *Rourke v. Garza*, 530 S.W.2d 794, 805 (Tex. 1975); 18B AM. JUR. 2D *Corporations* § 1397 (2021).

[6] *See also Mo. Pac. Ry. Co. v. Brazil*, 10 S.W. 403, 407 (Tex. 1888) ("The inquiry in any case in which it is claimed that a voidable contract has been ratified is, has the person whose right it was to annul it, either by word or act, when he had mental capacity sufficient to contract, and knowledge of what he had previously done, evidenced his consent that the contract shall stand?").

[7] *See also Rosenbaum*, 167 S.W.2d at 508; *Boydstun v. Rockwall County*, 24 S.W. 272, 274 (Tex. 1893) ("Ratification may frequently be inferred from acquiescence after knowledge of all the material facts, or from acts inconsistent with any other supposition."); *Mo. Pac. Ry. Co.*, 10 S.W. at 407 ("The inquiry in any case in which it is claimed that a voidable contract has been ratified is, has the person whose right it was to annul it, either by word

3

impliedly ratify an unauthorized pooling agreement "*by accepting royalties from the pool*." *Montgomery v. Rittersbacher*, 424 S.W.2d 210, 214–15 (Tex. 1968) (emphasis added). No one disputes that Strickhausen, having full knowledge of BPX's wrongful pooling, accepted substantial royalty payments based on the pooling. Yet the Court holds that a fact issue exists because she challenged the pooling before she began accepting its benefits. *See ante* at __. Consistent with our precedent, and based on these summary-judgment facts, I would hold that Strickhausen impliedly ratified the pooling agreement by ending discussions and negotiations with BPX and accepting the series of substantial royalty checks that she knew were paid and calculated based on her participation in the pooled unit.

The Court asserts that in this case, "the facts bearing on objective intent point in different directions." *Ante* at __. The summary-judgment record, however, does not support this contention. In September 2012, after BPX wrongfully pooled Strickhausen's lease to form the 320-acre White Kitchen No. 4 Gas Unit and then drilled the White Kitchen Unit No. 1H Well on her land, BPX sent her a letter asking her to consent to and ratify the pooling agreement. Her attorney responded the next month, stating that he would need additional information before he could advise Strickhausen regarding the ratification request. In the subsequent email exchange, Strickhausen's attorney asked when the well was completed, whether and how long it had been producing, and how Strickhausen's royalties would be calculated if she "elects not to sign the Ratification and consent to pooling." In an October 12 email, Strickhausen's attorney emphasized that "Ms.

_____

or act, when he had mental capacity sufficient to contract, and knowledge of what he had previously done, evidenced his consent that the contract shall stand?").

4

Strickhausen is not refusing to ratify the unit, she just wants to understand how a ratification would impact her royalty interest under her Lease."

BPX replied by email explaining that if Strickhausen refused to ratify the pooling, her royalty would be calculated based on the proportion that the "productive wellbore" under her tract bore to the well's total productive wellbore under all the pooled tracts. That same afternoon, Strickhausen's attorney sent a letter to BPX formally responding to BPX's September 20 letter. In this letter, he listed a number of questions including whether BPX believed it had authority to pool the lease and, if Strickhausen refused to ratify the pooling, how her royalties would be calculated and whether they would be suspended.

On December 10, 2012, BPX sent a letter to Strickhausen's attorney, attempting to answer his questions. BPX explained that if Strickhausen consented to pooling, BPX would pay her royalties on a "tract participation" basis, equating to a percentage of the total royalties based on the size of Strickhausen's tract relative to the acreage of the entire pooled unit. If she did not consent to pooling, she would be paid based on the productive-wellbore—also called the "perforated interval," "perforated wellbore," or "productive lateral"—basis. Comparing these calculation methods, BPX asserted that Strickhausen would receive greater royalties under the tract-participation basis if she agreed to pooling (about 25.03%) than if she refused and insisted on the productive-wellbore calculations (about 23.70%). BPX closed the letter by stating:

> [BPX] respectfully requests your cooperation by executing the enclosed Ratification of Designation of Pooled Unit. Should an

5

alternative method of payment or action be required the royalties will require being placed in suspense.[8]

Two months later, after Strickhausen failed to respond to BPX's December letter, BPX filed a certificate of pooling authority for the White Kitchen Unit 4 with the Texas Railroad Commission. And two days after that, BPX sent Strickhausen a check for $249,901.73 for royalties for production from August to December 2012. The check stub listed the "Property Name" as "WK Unit 4 1H." BPX then sent Strickhausen's attorney a settlement offer by email.

A week later, Strickhausen's attorney sent BPX a letter rejecting the offer and making a counter-offer. Specifically, Strickhausen offered to ratify the pooling agreement if BPX would pay her a bonus of $300,000, agree to drill a second well on her tract, and agree that Strickhausen could cash and deposit the $249,901.73 check as "payment of Ms. Strickhausen's royalties from the WK Unit 4 1H Unit from the date of first sales through December 2012."

Although BPX did not accept the counter-offer, Strickhausen deposited the check on March 11, 2013. Despite the lack of any settlement agreement, Strickhausen continued to accept and deposit monthly royalty checks designated as royalties from the "WK Unit 4 1H." By July 2014, Strickhausen had accepted and deposited $591,497.05 in royalty payments. After filing this suit in August 2014, Strickhausen continued to accept and deposit BPX's monthly royalty checks,

---

[8] The Court incorrectly asserts that BPX "threatened to put" Strickhausen's royalties "in suspense" if she did not "cooperat[e] by executing" the pooling agreement. *Ante* at ___, ___. To the contrary, BPX stated it would have to put the royalties in suspense if Strickhausen required "an alternative method of payment or action." The letter offered to pay using one of two alternative methods: the tract-participation method if she agreed to the pooling or the productive-wellbore method if she refused to ratify the pooling. To the extent the letter "threatened" to put the royalties in suspense, it did so only if Strickhausen rejected both of those alternatives and instead required a third.

6

ultimately totaling more than $700,000, all of which noted that they were for production from the "WK Unit 4 1H."

The Court concludes that the "totality of Strickhausen's words and actions" creates a fact issue on whether Strickhausen impliedly ratified the pooling because she "consistently asserted her right to reject pooling," she had a right to receive more than the amounts she accepted even if she rejected pooling, and her lease required her written consent to any pooling. *Ante* at ___, ___. I do not agree that any of these rationales prevent her acceptance of the royalty payments from being inconsistent with a rejection of the pooling agreement.

## A.     "Challenging" the wrongful act

Relying on *Hooks*, the Court holds that a fact issue exists in this case because some evidence indicates that Strickhausen "challenged" BPX's wrongful pooling of her lease. *Ante* at ___. This holding misconstrues both our implied-ratification precedent and our holding in that case. We have never held that implied ratification requires *both* the acceptance of benefits from the wrongful act *and* a failure to challenge the wrongful act. Either may suffice, and *Hooks* simply noted that the evidence in that case established both.

*Hooks* involved a lessor's implied ratification of an operator's prior act of amending a pooled unit to change its boundaries to exclude a well that had been included in the original pooled unit. *Hooks*, 457 S.W.3d at 65–66. The lessor knew the operator had amended the unit and accepted royalty payments calculated on production from the amended unit, but then sued for royalties based on production from the original pooled unit, arguing that the operator lacked authority to "unpool" the original unit. *Id.* We held that the lessor "ratified the amendment, having full knowledge that

something had changed and by his actions consenting to it, *failing even to challenge the new unit*." *Id.* at 66 (emphasis added).

We cited two principles to support our holding that the lessor's failure to "deny the validity of the new unit" precluded him from claiming a right to "receive royalties from the old unit." *Id.* First, "[p]rolonged silence or inaction in not asserting a known right is conduct that may amount to waiver," *id.* (quoting *Ohrt v. Union Gas Corp.*, 398 S.W.3d 315, 329 (Tex. App.—Corpus Christi–Edinburg 2012, pet. denied), and second, "[a]ny act inconsistent with an intent to avoid a contract has the effect of ratifying the contract," *id.* (quoting *Bob Montgomery Chevrolet*, 409 S.W.3d at 195). We then concluded that because the lessor had full knowledge of the amendment to the pooling unit, accepted royalties for the new unit, and "refus[ed] to challenge the new unit," he had ratified the amendment as a matter of law. *Id.*

We did not hold in *Hooks* that ratification requires both the acceptance of benefits and a failure to challenge the prior act. Instead, consistent with our precedent, *Hooks* merely recognized that a party may ratify an act through "any" conduct that is "inconsistent with an intent to avoid" that action. *Id.* (quoting *Bob Montgomery Chevrolet*, 409 S.W.3d at 195). Such inconsistent conduct may include (1) "[p]rolonged silence or inaction," *id.* (quoting *Ohrt*, 398 S.W.3d at 329), at least when the circumstances create some obligation to speak up or act,[9] (2) the filing of a suit

---

[9] *See, e.g.*, *Morrison v. Ins. Co. of N. Am.*, 6 S.W. 605, 608 (Tex. 1887) (explaining that those who "by failure promptly to repudiate their acts are held to ratify them, or to be estopped by their silence when they ought to have spoken"); *Bingham v. Barley*, 55 Tex. 281, 286 (1881) ("[A] silent acquiescence for a considerable time by an infant after arriving at full age is of itself a ratification of his conveyance."); *Giddens v. Byers' Heirs*, 12 Tex. 75, 78 (1854) ("[S]ilence or mere acquiescence of the principal, may well be taken as proof of a ratification."); *Nguyen v. Hoang*, 507 S.W.3d 360, 381 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("[R]atification may be inferred by the silence of the non-participating partner."). *But see Kelsey-Seybold Clinic v. Maclay*, 466 S.W.2d 716, 719 (Tex. 1971) (holding that when a partner acts solely for his own personal benefit or gratification, "the 'consent' that might be inferred from

8

to enforce the unauthorized action,[10] *or* (3) the acceptance of benefits arising from that action. We concluded in *Hooks* that both the lessor's failure to "deny the validity of the new unit" (that is, his "failure to challenge" the new unit) and his acceptance of the royalties established ratification as a matter of law. *Id*. But either one, without the other, was sufficient. *See id*.

The Court itself acknowledges "the well-established rule that ratification can arise from acceptance of benefits or from other intentional acts *despite a party's protestations to the contrary*." *Ante* at ___ (citing 2A C.J.S. *Agency* § 71 (2021)) (emphasis added). Indeed, an implied "ratification may occur notwithstanding the principal's protestations or expressions of disapproval . . . where the principal continues to retain the benefits which he or she obtained as a result of such act." 2A C.J.S. *Agency* § 71 (2021). "Even if he repudiates the act, his retention [of the benefits] constitutes an affirmance at the election of the other party to the transaction." RESTATEMENT (SECOND) OF AGENCY § 99 (AM. L. INST. 1958). Despite the party's protestations or expressions of disapproval, the "third party may elect to treat the principal's retention of the benefit as a ratification or may rescind the transaction." 2A C.J.S. *Agency* § 71 (2021). The Court asserts that it does "not cast doubt on" these well-established principles, but it then claims—without citing any authority—that courts, rather than the third party, can elect whether to treat the party's acceptance

---

the silence or inaction . . . does not render the Clinic vicariously liable for the damages claimed by plaintiff"); *Colvin v. Blanchard*, 106 S.W. 323, 325 (Tex. 1908) (finding silence insufficient to support ratification when party had no obligation to speak); *Gulf, C. & Santa Fe Ry. Co. v. Reed*, 15 S.W. 1105, 1107 (Tex. 1891) ("Mere silence, unless required to speak and act, or even satisfaction at the commission of the wrong, unaccompanied by some act of adoption, will not amount to ratification.").

[10] *Montgomery*, 424 S.W.2d at 214.

of the benefits as a ratification. *Ante* at ___. I must reject the Court's modern revision to our well-established and long-standing principles governing implied ratification.

**B.    "Consistently objected to pooling"**

Even if evidence that Strickhausen "challenged" the wrongful pooling could create a fact issue despite her knowing acceptance of the benefits of that pooling, such evidence does not exist in this summary-judgment record. Here, the evidence establishes that Strickhausen (through her lawyer) first told BPX that she was not refusing to ratify but needed more information, later "made it clear" that she would not ratify unless the parties reached a settlement that allowed her to accept and deposit the $249,000 check that was calculated and paid under the pooling arrangement, and then proceeded to accept and deposit that check and all of the others with full knowledge that they represented her interests as a participant in the pooling agreement. Under our precedent, Strickhausen's knowing and intentional acceptance of royalty payments from the pooled unit established an implied ratification of the pooling regardless of her *prior* expression challenging BPX's authority to pool.

The Court agrees that Strickhausen's present assertions that she lacked any *subjective* intent to ratify are insufficient to create a fact issue. *See ante* at ___. But so is Strickhausen's attorney's conclusory claim that "[t]hroughout these negotiations until the filing of this suit" he "made it clear" to BPX that Strickhausen "would not ratify the pooling of the White Kitchen No. 4 Gas Unit until a favorable settlement could be reached." *See ante* at ___. The record contains no evidence of how he made that point clear, much less that he did so "until the filing of this suit." Evidence to the contrary establishes that he told BPX that "Ms. Strickhausen is not refusing to ratify

10

the unit," that Strickhausen offered to ratify the pooling if BPX met certain conditions, and that Strickhausen then accepted the royalty payments even though BPX never responded to that offer or met those conditions.

Contrary to the Court's assertion, the record contains no evidence that Strickhausen "continued to attempt to negotiate a settlement." *Ante* at __. In fact, the only evidence establishes that BPX heard nothing from Strickhausen or her attorney from the time she sent the letter offering to settle and the time she filed suit a year and a half later, during which she continually accepted BPX's payments with full knowledge that they constituted royalties based on her participation in the pooled unit.

Strickhausen claims she first became aware of the well on her property through BPX's September 20, 2012 letter, in which it first sought her consent to pool her lease. That letter included the unit designation and other information explaining that the well was a horizontal well that continued under other tracts with which her tract had been pooled into the White Kitchen Unit 4. There was no other well on Strickhausen's property at the time,[11] and Strickhausen had in fact thought the lease had expired. There can be no legitimate dispute that Strickhausen knew—from the moment she learned of the well's existence—that her lease had been pooled and that the well producing on her property was producing from a pooled unit.

---

[11] BPX stated later that Strickhausen's property "was not of a sufficient size to make it feasible for [BPX] to drill an efficient, economic horizontal well limited solely to the Property itself," and that "pooling was essential to the development of this area of the Eagle Ford Shale. If [BPX] had not been able to drill a well through both the Property and the Contiguous Tracts, [it] would not have drilled any well on the Property."

After learning that her lease had been pooled, Strickhausen's attorney engaged in discussions and negotiations with BPX. While doing so, however, he told BPX, "Please understand that Ms. Strickhausen is not refusing to ratify the unit." He then offered that Strickhausen would ratify the pooling if BPX met certain conditions, including that the check BPX had sent to Strickhausen "will be honored . . . and considered as payment of Ms. Strickhausen's royalties *from the WK Unit 4 1H Unit*." (Emphasis added.) And although BPX never responded to that offer or met those conditions, Strickhausen accepted eighteen monthly royalty checks before filing suit.

Relying on Strickhausen's attorney's bare and conclusory statement that he "made it clear" to BPX that Strickhausen "would not ratify the pooling . . . until a favorable settlement could be reached," the Court claims that Strickhausen continued to challenge the pooling. *Ante* at __, __ n.8, __. The record contains no evidence of how Strickhausen's attorney made that point "clear" to BPX, and BPX maintains—and Strickhausen has not attempted to refute—that Strickhausen made no "word of complaint" after depositing the first check on March 11, 2013, until she filed suit on August 1, 2014. Strickhausen provides no evidence to support her claim that she or her attorney continued to object to the pooling. In fact, immediately preceding the statement by Strickhausen's attorney that he "made it clear" that Strickhausen would not consent to pooling, he acknowledged that Strickhausen and BPX engaged in only a "several-months-long negotiation," not a negotiation lasting the entire year-and-a-half between Strickhausen's receipt of the check and filing suit.

The statement by Strickhausen's attorney that Strickhausen remained opposed to pooling is precisely the kind of evidence of subjective intent that the Court agrees is irrelevant. When a

12

person's actions are inconsistent with an intent to reject a prior act, her subjective "mental reservations" are irrelevant to the ratification analysis. *Oram v. Gen. Am. Oil Co. of Tex.*, 513 S.W.2d 533, 534 (Tex. 1974) (per curiam).[12] Strickhausen's acts of continually accepting the royalty payments as a participant in the pooled unit are more than "a single act," *ante* at __, or a "trap for the unwary," *ante* at __. They are the unequivocal evidence of an intent to accept the benefits of pooling.

## C.     "Inconsistent" conduct

The Court suggests that Strickhausen's acceptance of BPX's royalty payments was not inconsistent with a rejection of the wrongful pooling because BPX owed her royalties on the production from the well drilled on her tract even in the absence of pooling. *See ante* at __. This suggestion, however, ignores the conclusive evidence that Strickhausen knew that the payments were made and calculated based on her participation in the pooled unit.

To be sure, not every acceptance of any benefit will imply ratification. Accepting an "underpayment," for example, "is not inconsistent with claiming an entitlement to more." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 778 (Tex. 2017) (holding parties' acceptance of royalty payments on one well was not inconsistent with demand for royalty payments on that well and another).[13] For the acceptance of benefits to be inconsistent with rejection of the contract,

---

[12] *See also Jobe v. Tex. Utils. Elec. Co.*, No. 05-94-01368-CV, 1995 WL 479645, at *5 (Tex. App.—Dallas Aug. 14, 1995, no writ) (not designated for publication) ("Mental intent or reservation does not affect determination of the question of ratification."); *Rogers v. Wolfson*, 763 S.W.2d 922, 924 (Tex. App.—Dallas 1989, writ denied) ("Mental intent or reservation, though, does not affect determination of the question of ratification.").

[13] *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 536–37 (Tex. 2002) (finding no implied ratification when party accepted only general benefits of plaintiff's participation in medical-residency program as opposed to specific benefits of plaintiff's conduct as a resident in that program); *see also Black Gold Marine, Inc. v. Jackson Marine Co.*,

the benefits accepted must be the "direct, certain, and proximate result" of the unauthorized act. *F.M. Stigler*, 609 S.W.2d at 757.

Strickhausen argued in the trial court, and the Court repeats here, that BPX owed her royalties totaling twice the amount BPX paid her, because BPX had commingled her gas with others' and could not reasonably allocate the amount that was hers, making BPX liable for royalties on all of the gas produced from the well. Thus, the Court claims, Strickhausen's acceptance of the royalty checks was not inconsistent with an intent to reject the pooling because she was entitled to more royalties than she accepted. *Ante* at __; *see Samson*, 521 S.W.3d at 778. But the record contains no evidence that she ever communicated that position to BPX before she filed suit, some seventeen months after she began accepting BPX's payments.

Even if Strickhausen were correct that without her ratification of the pooling agreement, BPX owed her a greater amount than it had paid, those facts do not alter the nature of the payments she actually accepted. Her knowledge of the nature of the payments makes her acceptance of those payments inconsistent with an intent to reject the pooling, regardless of the amount. Strickhausen knew BPX calculated the payments on a tract-participation basis, reflecting her position as a participant in the pooled unit. She had full knowledge, in other words, that the payments were the "direct, certain, and proximate result" of the unauthorized act of pooling. *See F.M. Stigler*, 609 S.W.2d at 757. She cannot now, after accepting those payments with such knowledge, treat them

---

759 F.2d 466, 471 (5th Cir. 1985) (holding actions to merely "preserve the status quo" did not exhibit a knowing ratification); *Foster v. Atl. Refin. Co.*, 329 F.2d 485, 490 (5th Cir. 1964) ("By keeping less than was due them, and something to which they were entitled in any event, the Fosters have not ratified the act of Atlantic in selling their royalty gas for less than the prevailing market price."); 2A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 773 (2020) (listing examples of conduct held not inconsistent with rejection of unauthorized acts).

14

as if they were calculated on a perforated-wellbore basis or on some other method of calculation, or as if they constituted the undisputed portion of a larger amount she later claimed. Although she could have retained *less* than what she was owed without implying ratification, she could not retain something *different* than what she was owed. *See Yelderman v. McCarthy*, 474 S.W.2d 781, 784 (Tex. App.—Houston [1st Dist.] 1971, writ ref'd n.r.e.) ("A creditor who accepts and cashes a check tendered as full payment of a disputed claim cannot vary the legal effect of such acceptance as an accord and satisfaction by protesting that he is accepting the check as part payment only." (citing *Indus. Life Ins. Co. v. Finley*, 382 S.W.2d 100, 104, 106 (Tex. 1964); *Groves v. Sawyer*, 384 S.W.2d 193, 194 (Tex. App.—Eastland 1964, writ ref'd n.r.e.); *Burgamy v. Davis*, 313 S.W.2d 365, 368 (Tex. App.—Fort Worth 1958, no writ))).

Strickhausen could have indicated her disagreement with the royalty payments by refusing the checks, demanding that the royalties be held in suspense, or perhaps even by making it known to BPX that she was disputing BPX's calculations as she accepted the checks. But the record contains no evidence that Strickhausen ever claimed to accept the checks under some form of protest. *Cf.* TEX. BUS. & COM. CODE § 1.308(a) ("A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved. Such words as 'without prejudice,' 'under protest,' or the like are sufficient."). Although Strickhausen's proposed settlement included a demand for a $300,000 bonus payment and other additional consideration, she accepted and deposited the royalty checks, without any statement of protest, even though BPX never responded to that offer. Nor did Strickhausen ever request that the royalty payments be suspended until the

15

parties resolved their dispute over how her royalties should be calculated.[14] *See* TEX. NAT. RES. CODE § 91.402(b) (stating that royalty payments may be suspended when there is "a dispute concerning title that would affect distribution of payments" or reasonable doubt that the payee "has sold or authorized the sale of its share of the oil or gas to the purchaser of such production").

The summary-judgment evidence conclusively establishes that Strickhausen knew that her lease had been pooled, that the well on her property was a horizontal well drilled through the pooled unit, and that the royalty payments from BPX were for royalties from the horizontal well on the pooled unit, calculated on a tract-participation basis. Strickhausen cannot now claim that she did not know that the royalties were paid based on her participation in the pooling agreement. *See Leopard v. Stanolind Oil & Gas Co.*, 220 S.W.2d 259, 264 (Tex. App.—Dallas 1949, writ ref'd n.r.e.) ("The acceptance of the royalty checks by appellants with knowledge that they were in payment for royalty from the Holland Well and that the Holland Well and their land, together with other lands of third parties had been unitized by appellees, was a ratification of such unitization by appellees.").

The fact that the 1H well was drilled on Strickhausen's tract, as opposed to on one of the other pooled tracts, does not alter that conclusion. Regardless of the amount she *could* have been paid under the lease, she knew the nature of what she *was* paid, and she accepted those payments.

---

[14] The Court chastens BPX for "threaten[ing]" to place the royalties in suspense until the parties came to terms with the amount of royalties owed. *Ante* at __. Yet this is precisely the process Strickhausen's lease called for and the process for which Strickhausen advocated in the courts. Strickhausen's lease states that if there is a dispute regarding ownership "as to all or any portion of the . . . royalties payable hereunder," the "disputed royalties" must be placed in an escrow account. And in this Court, Strickhausen argues that BPX "should have offered to pay her the amount of the undisputed royalties for the well drilled on her property and escrowed any disputed amount," but she acknowledges that BPX made no such offer.

16

*See Yelderman*, 474 S.W.2d at 784 ("When appellants accepted the royalty checks tendered as payment of their specified interest in the gas unit, which was properly described, they ratified the action of appellees in unitizing the leases despite the fact that appellants informed appellees that they were applying the sum tendered as a partial payment of the royalty due them under the terms of the lease. They were authorized to accept the payment only in accordance with the terms under which it was sent."). Strickhausen's acceptance of those payments was necessarily inconsistent with her prior objection to the pooling agreement.

**D.  Lease language precluding implied ratification**

Finally, the Court agrees with Strickhausen's argument that the lease's no-pooling clause precluded the possibility of implied ratification, or at least creates a fact issue that precludes summary judgment. *See ante* at ___. The Court states that "Strickhausen's objective intent . . . must be examined in light of both parties' knowledge that she was protected by the 'no-pooling-without-my-written-consent' clause against accidentally or impliedly consenting to pooling." *Ante* at ___. I agree that Strickhausen's actions must be considered with the language of the agreement, but I disagree that her actions were merely "accidental" or did not rise to implied ratification *despite* the lease's language.

The issue here is not whether BPX breached the agreement by pooling Strickhausen's lease without her consent. The issue is whether Strickhausen impliedly ratified that wrongful act and agreed to the pooling despite the written lease's language. Notwithstanding the lease's no-pooling clause, Strickhausen and her attorney engaged in months of negotiations to ratify the pooling agreement, had proposed a settlement offer, and accepted seventeen months of royalty payments

from that pooling. Especially considered in light of years of precedent that "accepting royalties from the pool" ratifies the pooling, *Montgomery*, 424 S.W.2d at 214–15, Strickhausen's conduct simply cannot be considered mere accident. It conveyed nothing less than her intention to accept the benefits of the pooling and thereby ratify the pooling agreement.

## II.
## Conclusion

Under our precedent governing implied ratification, Strickhausen's actions in knowingly accepting and depositing royalty checks calculated on the production of gas from the White Kitchen No. 4 pooled unit speak louder than the words of her prior objection to the pooling agreement. Under the evidence in this record, Strickhausen impliedly ratified the pooling agreement as a matter of law. I would reverse the court of appeals' judgment and reinstate the trial court's order of summary judgment on the controlling question of law presented in this case. Because the Court does not, I respectfully dissent.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: June 11, 2021